[Cite as *True Care Early Learning Ctr. v. Ohio Dept. of Job & Family Servs.*, 2020-Ohio-954.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| TRUE CARE EARLY LEARNING CENTER | : | |
| | : | |
| | : | Appellate Case Nos. 28532, 28533, 28534 |
| Plaintiff-Appellee | : | |
| | : | |
| v. | : | Trial Court Case Nos. 2018-CV-552, 2018-CV-597, 2018-CV-1525 |
| | : | |
| OHIO DEPARTMENT OF JOB AND FAMILY SERVICES | : | |
| | : | (Civil Appeal from Common Pleas Court) |
| Defendant-Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of March, 2020.

. . . . . . . . . . .

JOHNNA M. SHIA, Atty. Reg. No. 0067685, P.O. Box 145, Springboro, Ohio 45066
    Attorney for Plaintiff-Appellee

THERESA R. DIRISAMER, Atty. Reg. No. 0093374, 30 East Broad Street, 26th Floor, Columbus, Ohio 43215
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In these consolidated cases, the Ohio Department of Job and Family Services ("ODJFS") appeals from an order reversing its administrative revocations of continuous licenses for childcare centers located on Salem Avenue and Shiloh Springs Road in Trotwood, Ohio, and its revocation of a provisional license for a childcare center located on North Dixie Drive in Dayton, Ohio. The childcare centers, which will be designated, respectively, as "Salem," "Shiloh," and "Dixie," were owned and operated by Appellee, True Care Early Childhood Learning Center, Inc. ("True Care.").

{¶ 2} According to ODJFS, the trial court misapplied R.C. 119.12 when reversing the administrative orders by requiring that revocation be "necessary" to affirm the agency and by considering extenuating circumstances. ODJFS also maintains that the trial court erred by imposing requirements for revocation that do not exist under R.C. 5104.04. Finally, ODJFS contends that the trial court erred by concluding that the administrative orders revoking the licenses of the three centers were not supported by reliable, probative and substantial evidence.

{¶ 3} For the reasons that follow, we agree with ODJFS on all points. Accordingly, the judgment of the trial court will be reversed, and these causes will be remanded with instructions to reinstate the administrative orders of the ODJFS.

I. Facts and Course of Proceedings

{¶ 4} Because the facts in each case differ and the proceedings only merged when the trial court consolidated the cases, we will discuss the facts and proceedings of each case separately, beginning with Salem, which was the oldest of the three centers. Before doing so, we will briefly discuss some facts and the licensing process that apply

commonly to all three cases.

{¶ 5} Rhonda Thomas (now Chancellor-Holloway) began caring for children in her home in 1997, and started her first center in 2003.[1]   That center, the Main Street center, was voluntarily closed.   Rhonda started Salem in 2006, Shiloh in 2012, and Dixie in 2014.

{¶ 6} Childcare centers are licensed by ODJFS and are supervised by licensing specialists.   The ODJFS field office in Dayton covers 14 counties and generally has 16 licensing specialists, each of whom have a caseload of about 65 centers.   At the time of this litigation, two supervisors in the office (Kelly Paull and Trentae Taylor), each supervised eight specialists.   At times, supervisors attend inspections with specialists to make sure they are following procedures.   In addition, supervisors approve licenses, recommend revocations, approve changes of locations and administrators, and speak with providers.

{¶ 7} After a proposed childcare center applies for approval, a licensing specialist conducts a pre-licensing inspection.   This is an initial on-site inspection to assure compliance with all agency rules.   Centers must be fully compliant with all the rules before their application can be approved.   Initially, applicants are granted a provisional license, which covers the first 12 months.   During that time, three inspections are conducted to make sure the center is complying with the rules.

{¶ 8} When the provisional license period ends, a center will be amended to full licensure status, which generally occurs after submission of corrective action plans for what is uncovered during the three provisional license inspections.   A center that is provisionally licensed must respond to all non-compliances.   However, ODJFS also must

---

[1] For ease of discussion, we will refer to Ms. Chancellor-Holloway by her first name.

consider whether a center has had serious risks or repeat non-compliances and assess whether the center is moving in a direction where it will be compliant with the rules. Rather than granting full licensure or revoking a provisional license at the end of the provisional period, ODJFS can monitor or conduct an extra visit. However, ODJFS cannot amend to a full license if a program has not addressed its non-compliances.

{¶ 9} Once a continuous license is approved, a center is inspected annually. During this compliance inspection, a licensing specialist, using software designed for that task, goes through each rule and must mark the center compliant or non-compliant. Every rule has findings, and the specialist chooses the finding that is appropriate to the violation. The software also generates a report, which, in the old system, was emailed to the center. In the new system, each center has a profile and the report is placed in the profile, which the center can access.

{¶ 10} Some violations of rules are more serious than others. However, a specialist does not have the ability to decide if a violation is a serious risk, because a standard set of rules exist that deem certain violations serious risks. For example, a rule defines what ratios of childcare staff must exist for specified numbers of children in infant, preschool, and school-age children. A violation of this rule is deemed a serious risk because the State has decided what amount of supervision is safe based on the children's ages.

{¶ 11} In addition to the annual inspections, specialists conduct complaint investigations when ODJFS receives reports of violations. Complaints can be received from anyone and can be anonymous. The scope of this investigation differs from a compliance investigation. A specialist will investigate what has been alleged, but will

also document anything blatantly wrong as an additional non-compliance. During every complaint inspection, the specialist will take a count to insure that the program is in ratio, i.e., that the ratio of childcare staff members to children fits within the guidelines the State has mandated. The software also generates a report for complaint investigations. Supervisors review specialist reports and track programs for repeated non-compliances, serious risks, and anything that appears to need monitoring. When an inspection is finished, the specialist (and supervisor, if one has accompanied the specialist) conduct an exit interview with the center's administrator.

{¶ 12} When violations are documented, the report tells the center what actions it needs to take and whether documents need to be submitted. The center is then required to respond within a certain period of time, typically within 30 days, with a corrective action plan on how the violation will be corrected, and with any documents that have been requested. If a center disagrees with a non-compliance finding, it can appeal by submitting an email to the specialist or to the supervisor within seven days after the inspection. However, an appeal is not the same thing as a corrective action plan; an appeal disputes the finding of non-compliance, while a corrective action plan details how a center will address the non-compliance. If an appeal is filed regarding a center assigned to one supervisor, the other supervisor will review and respond to the appeal.

{¶ 13} Specialists do not make revocation decisions on their own. They may initiate the process, but the supervisor reviews and makes the recommendation to his or her supervisor (the Bureau Chief) and the Quality Assurance Administrator. If approved, the recommendation is then transmitted to the ODJFS enforcement staff. Concerning the revocation process, ODJFS looks at a program's compliance history. Although

ODJFS is allowed to look back five years, typically it looks back two years to decide where a program stands in relation to compliance. This involves whether the program has repeat "out of compliances," whether those are being corrected, whether the program has said that problems have been corrected when they were not, how many serious risk non-compliance rules were violated, and how many points were accumulated. Salem Hearing Transcript (Salem Tr.), p. 100; Shiloh Hearing Transcript ("Shiloh Tr.), pp. 91-98.[2]

{¶ 14} In December 2016, ODJFS changed its rules and the point system. Previously (during the inspections at issue here), there were regular non-compliances and serious risk non-compliances. Some serious risks were worth one point, some were worth two, and some were worth six. As an example, a ratio violation was assessed two points. Salem Tr. at p. 329. Under the new system, which divided violations into low, moderate, and severe risks, a ratio violation was three points. *Id.*

{¶ 15} ODJFS is very clear that programs can accumulate no more than 12 serious risk compliances during the provisional period. Continuous license holders are held to a higher standard because they have been in business long enough that they should not have repeat out of compliances and should not be assessed many serious risk non-compliances. *Id.* at p. 108.

{¶ 16} As part of the revocation process, a "Recommendation for Revocation Matrix" is prepared. The matrix is a spreadsheet which includes the specified number of

---

[2] The administrative records in each case contain both transcripts and documents, and each were all initially numbered separately before the transcript was prepared. For consistency of discussion, our references will be to the numbers used for the administrative record.

years of compliance history and calculates points based on each inspection, complaint, and out of compliances, and includes supporting documentation. This matrix is sent to the Bureau Chief, Assistant Bureau Chief, and Quality Assurance Coordinator, who decide if the revocation recommendation is accepted. If so, the information is sent to the enforcement staff, which prepares a proposed order. A notice of an opportunity for a hearing on the proposed revocation is then sent to the center, and the administrative process follows. Salem Tr. at pp. 102-103; Shiloh Tr. at pp. 107, 127-129, 321; Dixie Hearing Transcript ("Dixie Tr."), p. 80.

## A. Salem

{¶ 17} Salem was opened in 2006. No evidence was presented about its performance before 2014, but in 2014, Keyauna Baber was the licensing specialist assigned to Salem. In 2015, Salem was transferred to a new specialist, Stephanie Walters, who had ended her probationary period. As a result, some cases of other specialists were assigned to Walters, who worked as Salem's specialist from July 2015 to March 2016, when she transferred to Columbus. Salem Tr. at pp. 94 and 119-120. Margaret Conrad then became the specialist, and she was still assigned to Salem at the time of the August 2017 revocation hearing. *Id.* at pp. 93 and 94.

{¶ 18} For this revocation, the listed violations occurred between September 8, 2015, and December 2, 2016. State's Ex. 2, Salem Tr. at pp. 478-485.[3] At the time,

---

[3] The State's exhibits were numbered, and all the centers' exhibits used letters. From now on, when we refer to an exhibit, it will be by number or letter, together with the appropriate transcript location. During the factual discussion of each center, references to the exhibits also will be to the exhibits for that particular center, unless otherwise indicated.

Rhonda's son, David Jones, was Salem's administrator and had been since 2014. *Id.* at p. 297. During the relevant time period, one annual inspection occurred on February 25, 2016, and complaint inspections took place on September 8, 2015, October 21, 2015, June 9, 2016, August 3, 2016, August 19, 2016, September 15, 2016, November 30, 2016, and December 2, 2016. *Id.* at pp. 148, 152, 156, 175-176, 184-185, 189, 225-226, 233-234, and 240-242; Ex. 5B at pp. 509-511.

{¶ 19} Walters conducted the first three inspections, Conrad conducted the June 2016 inspection, and Baber conducted the next three inspections because Conrad was on maternity leave. Conrad also conducted two complaint inspections on November 30, 2016, and another on December 2, 2016. *Id.* at pp. 233-235. The latter two inspections are not reflected in the revocation matrix, but are included in the findings on which the revocation was based. *See* Ex. 2 at pp. 478-485. Of these nine inspections, a supervisor (either Taylor or Paull) attended the inspection along with the specialist six times. *Id.* at pp. 153, 185, 189, 226, 235, and 242.

{¶ 20} During just the inspections from September 8, 2015 to September 26, 2016, Salem accumulated 23 serious risk points. *See* Salem Tr. at p. 109 and Ex. 13 at pp. 597-599. More serious risk violations occurred in later inspections as well. Among the serious risk violations that occurred during inspections were: being out of ratio; staff members using inappropriate guidance and management techniques (hitting a child and on another occasion, threatening and restraining a child); failure to receive criminal background checks of employees and to document any follow-up; hazardous conditions on the outdoor play area, including fences with gaps through which a child could leave the premises, hazardous debris on the play area, slides without protective mulch, and a

latch that a child could easily open, leading to a parking area bordering a busy street[4]; incomplete and missing medical plans for children; failure to provide care to an injured child; abuse (grabbing a child by the arm and restraining the child); and unsafe indoor equipment. *Id.* at pp. 149, 151-155, 156, 161-163, 165-166, 180, 183, 185-186, 191, 228, 231, 233-236, 247, and 240; Ex. 7B at p. 536, Ex. 8B at pp. 545 and 547, Ex. 10-B at 561, Ex.11-C at p. 578, and Ex. 12B at p. 587.

{¶ 21} Salem never appealed any of the above violations or any other violations to its supervisor. On September 26, 2016, Taylor recommended that Salem's license be revoked. She testified that she was concerned about the health and well-being of the children who attended Salem based on the number of times Salem's name crossed her desk, whether that be inspection reports that were full of non-compliances or a complaint intake form with a list of alleged rule violations. Salem Tr. at p. 104. Further, while Taylor had accompanied her specialists in the summer and fall of 2016, things were not changing; they were getting worse. *Id.*

{¶ 22} Before the notice of revocation was issued to Salem on December 22, 2016, Taylor also recommended in the first week of December 2016 that Salem's license be suspended. On November 22, 2016, ODJFS received a complaint about potential physical abuse of a child. On November 25, 2016, ODJFS also received a complaint that a child was exposed to inappropriate language and that a teacher had used inappropriate guidance techniques. *Id.* at pp. 233-234. During the inspection of both complaints on November 30, 2016, a teacher was heard threating a child and was seen

---

[4] The unsafe latch on the gate was documented at the June 9, 2016 inspection and was not fixed by the time of the December 2, 2016 inspection. Salem Tr. at pp. 83, 136-138, 226, and 228-229.

improperly restraining the child. The program was also found out of ratio twice during this inspection. *Id.* at p. 239.

**{¶ 23}** A few days later, on December 2, 2016, ODJFS received another complaint alleging that a child's ear had been lacerated due to a staff member twisting his ear and that the child had developed diaper rash from his diaper not being regularly changed. Other complaints included that a child had allegedly fallen and busted his chin, and staff did not provide immediate care; that a staff member had reached out and "snatched" a child; that a staff member had called a child ugly; that a staff member had refused children food; that Salem served spoiled milk and moldy bread; and that a staff member placed a child in a closed room. *Id.* at pp. 240-241 and Ex. 12-A at p. 583.

**{¶ 24}** Due to the seriousness of the allegations, Baber and Taylor went to Salem that day, accompanied by representatives from Montgomery County Children Services ("MCCS") and the Trotwood Police Department. Salem Tr. at p. 242. The investigation report indicates that all the allegations (other than the bad milk and bread, and calling a child ugly) were substantiated. *See* Ex. 12-B at pp. 586-589. There is no indication that Salem submitted an appeal letter within seven days of the issuance of the report. However, Salem did administratively appeal a suspension order that was delivered to it on December 8, 2016.[5]

---

[5] An order issued by ODJFS on May 9, 2017, upheld the suspension and found that ODJFS had met its burden with respect to the diaper changing issue, the neglect of a child who was injured, and the serious risk to a child when a Salem employee "forcefully grabbed a child." Ex. E, pp. 619-621. ODJFS, therefore, upheld the suspension. Subsequently, the trial court rejected Salem's appeal of the suspension. *See True Care Early Childhood Learning Center v. Ohio Dept. of Job and Family Servs.*, Montgomery C.P. No. 2017-CV-2392 (Feb. 6, 2018). At Salem's request, we dismissed its appeal from the trial court decision. *See True Care Early Childhood Learning Center v. Ohio Dept. of Job and Family Servs.*, 2d Dist. Montgomery No. 27922 (Decision & Entry, May

{¶ 25} As noted, Taylor recommended on September 26, 2016, that Salem's childcare license be revoked, and her recommendation was forwarded to other individuals to consider. Ultimately, on December 22, 2016, ODJFS issued a notice of opportunity for a hearing regarding the proposed revocation. The revocation notice was based on Salem's failure to comply with nine different provisions in the Ohio Administrative Code. Some rules were violated more than once, with the result that a total of 21 violations were alleged. Salem requested a hearing, which took place before a hearing examiner on August 3 and 4, 2017. The hearing examiner then issued a report and recommendation on October 30, 2017, recommending that Salem's license be revoked.

{¶ 26} After Salem filed objections to the report, ODJFS issued an administrative order on January 30, 2018, approving and adopting the findings of fact and conclusions of law in the hearing examiner's report. Accordingly, ODJFS revoked Salem's childcare license. Salem then filed an administrative appeal with the trial court on February 5, 2018. After consolidating this case with the two other cases and hearing oral argument, the trial court issued a decision on August 27, 2019, vacating the order of revocation and remanding the case to ODJFS with an instruction to reinstate Salem's license. ODJFS timely appealed from the trial court's decision.

B. Shiloh

{¶ 27} Shiloh was licensed in 2012. Kim Suermann was the initial licensing specialist for Shiloh and was with the program until the spring of 2014, when Keyauna

31, 2018). "Under established law, courts may appropriately take judicial notice of judicial opinions and public records that are accessible via the internet." (Citations omitted.) *State v. Carr*, 2d Dist. Montgomery No. 28360, 2020-Ohio-42, ¶ 4, fn. 2.

Baber took over.   Shiloh Tr. at pp. 139 and 141-142.   Nancy Schmitt, another licensing specialist, also conducted inspections to help Baber with her caseload.   *Id.* at p. 191. Kelly Paull was the supervisor for both Suermann and Baber during the relevant time period and recommended revocation of Shiloh's license based on 57 violations of 17 rules between January 29, 2014 and June 27, 2016.   *Id.* at p. 126 and Ex. 2, p. 647.   At the time, Ashley Thomas was Shiloh's administrator.

{¶ 28} During the relevant time period, standard compliance inspections occurred on August 24, 2014, April 14, 2015, June 19, 2015, April 20 and 21, 2016, and June 27, 2016.   Complaint inspections took place on January 29, 2014, May 27, 2014, September 12, 2014, September 15, 2014, September 16, 2014, July 7 and 15, 2015, and August 5, 2015.[6]   *Id.* at pp. 144, 148, 158, 193, 198, 217, 223, 227, 245, 271, 278, and 303. Suermann conducted two inspections, Schmitt conducted one inspection on her own and another with Baber, and Baber conducted the rest.   *Id.* at pp. 148, 152, 191, and 258-259.   During these inspections, Shiloh accumulated 205 non-compliances and 48 severe risk points.   Ex. 16 at pp. 883-887.

{¶ 29} Suermann had concerns with Shiloh's compliance history when she was its specialist and discussed them with Shiloh during various inspections.   Shiloh Tr. at p. 178.   During Suermann's tenure, Shiloh had a lot of non-compliances in regard to record-keeping, accessibility to records, general cleanliness, and issues with staff.   *Id.* at pp. 178-179.

---

[6] Two other inspections were conducted on March 19, 2014 and March 28, 2016, but there was no specific testimony about these inspections, and any violations from these inspections were not used as grounds in the revocation notice.   *See* Ex. 16, pp. 884-887 and Ex. 2 at pp. 647-656.

{¶ 30} As noted, Baber took over as specialist in the spring of 2014, and issues continued. Among the serious risk violations before and after that time were: failure to supervise children traveling off premises (a sleeping child was left on a bus for 45 minutes in late January 2014); missing documents for criminal background checks (criminal check for adult record indicated possibility of a prohibitive offense, but did not include a conviction or a plea of guilty to the offense; failure to request criminal records checks for employees); incomplete or missing medical/physical care plans; failure to act responsibly for child safety; hazardous materials were within reach of children; ratio problems, both in a vehicle and in classrooms; failure to follow Shiloh's own drop-off and pick up policies (child was left at school); failure to have verification on file that three of five vehicles used for transportation had received the required annual safety check; physical abuse, as well as failure to report physical abuse of a child; and failure to safely care for infants. *Id.* at pp. 148-149, 152, 196, 202-203, 154-156, 163-165, 173, 219, 227, 230, 237-238, 240-242, 245-246, 248, 249, 252, 255-256, 267-268, 269, 272-274, 277, 281, 285, 287, 305, 308, 310, and 313; Ex. 5, pp. 705 and 708 and Ex. 10, p. 763.

{¶ 31} As examples, on January 28, 2014, ODJFS received a complaint that a sleeping child had been left on the bus after being transported from his school. The following day, Suermann conducted an investigation in conjunction with MCCS and the Police Department. Shiloh Tr. at pp. 146-147. MCCS later notified ODJFS that neglect had been substantiated. *Id.* at p. 151. While at Shiloh for that complaint inspection, Suermann also found other violations, including a lack of supervision, as three children were not supervised during their arrival as they walked to the center from the bus and came unattended into the center. *Id.* at p. 153.

{¶ 32} A complaint investigation was also conducted on September 12, 2014, because the center had left a child at school. *Id.* at p. 222. Rather than follow its policies, which required follow-up with parents, Shiloh had relied on information like other children on the bus or school personnel to say a child was not getting on the bus. *Id.* at p. 226. This complaint was substantiated. *Id.* at p. 227.

{¶ 33} Another example of a serious risk violation was the physical abuse of a child by a teacher on June 19, 2015. The complaint, which was made to ODJFS on July 7, 2015, was that a childcare staff member had used inappropriate child guidance and management techniques, and that the administrator failed to protect the child from an unsafe person or situation. *Id.* at p. 258. Specifically, a child was dragged across the floor by her arm, slammed in a chair, then picked up and spanked. *Id.* Two or three other staff members were in the room at the time and watched, but did not report the incident to anyone. *Id.* at p. 260. The complaint also alleged that Shiloh's director met with the parents but did not take any action other than dis-enrolling the child. Ex. 12-A at p. 803.

{¶ 34} Baber investigated this incident on two days (July 8 and July 15, 2015), and MCCS was there as well. Shiloh Tr. at p. 259. Video substantiated everything mentioned in the intake form. *Id.* at p. 260. MCCS also substantiated the employee's physical abuse. *Id.* at p. 262. The employee was interviewed, and her explanation was that she was unaware she could not do that. *Id.* at p. 266.

{¶ 35} In December 2015, Paull, Taylor, and Baber met with Rhonda, Rhonda's husband, and Ashley Thomas for an in-office meeting. The purpose of the meeting was to discuss compliance at the Shiloh and Dixie locations. At the meeting, Rhonda was

also given an opportunity to discuss any concerns she had about the Salem location. Before the meeting, Rhonda had said that she had concerns with Keyauna, that Keyauna was not helping her, and that they were not communicating. Salem Tr., p. 96; Shiloh Tr. at pp. 105, 119, and 494. Neither Taylor nor Paull found any substance to the complaints against Keyauna, nor did they find anything wrong that Keyauna had done. Shiloh Tr. at p. 133; Salem Tr. at pp. 96 and 133-134; Dixie Tr., pp. 81-82.

{¶ 36} According to the ODJFS witnesses, True Care was given an indication at the December 2015 meeting that its licenses were in danger. Shiloh Tr. at p. 321. During the meeting, some repeated non-compliances and some bigger issues, like responses to non-compliances, were discussed. Paull discussed the fact that saying that everything (violations) had not been seen or did not happen was inappropriate. *Id.* at pp. 105-106. The appeal process was also explained, and Shiloh was told that if this was the way Shiloh felt, an appeal was needed. However, after the appeal, Shiloh needed to respond to the non-compliance with a corrective action plan. *Id.* at p. 106. The responses Shiloh had been submitting challenged whether the specialist had seen the violation and were not appeals because they were not submitted within the required time frame. *Id.* at p. 105. During the entire case, Shiloh never submitted any appeals to its specialist or to Paull.

{¶ 37} After the meeting, Paull did not switch specialists. In general, ODJFS does not do that, because a precedent would be created of changing specialists whenever providers do not like them. Shiloh Tr. at p. 133. However, between December 2015 and July 27, 2016, Paull accompanied Keyauna on all further inspections but one, because in Shiloh's corrective action plans, Paull continuously saw a pattern of

statements that a non-compliance did not happen and the specialist did not see what had been marked as non-compliant. As a result, Paull functioned as a "second set of eyes to verify that everything that was marked non-compliant was, indeed, non-compliant." *Id.* at p. 103. She did not find any problems with how Baber acted toward Shiloh. *Id.* at p. 134.

{¶ 38} A significant improvement did not occur after the December 2015 meeting. As a result, on June 30, 2016, Paull and Baber recommended that Shiloh's continuous license be revoked. *Id.* at pp. 320-323 and Ex. 16 at p. 884. As noted, for inspections between January 29, 2015 and June 27, 2016, Shiloh amassed a total of 205 non-compliances and 48 penalty points. Ex. 16 at pp. 883-887.

{¶ 39} On December 22, 2016, ODJFS sent Shiloh a notice of opportunity for a hearing regarding the proposed revocation of its license, based on 57 violations of 17 rules. After Shiloh requested a hearing, hearings were held on June 26 and 27, 2017. The hearing examiner then issued a report and recommendation on October 30, 2017, recommending that Shiloh's license be revoked. Shiloh Tr. at pp. 899-917. Although Shiloh filed objections, the Director of ODJFS approved and adopted the hearing examiner's findings of facts and conclusions of law, and issued an order on January 26, 2018, revoking Shiloh's license.

{¶ 40} Shiloh then filed an administrative appeal with the trial court on January 31, 2018. After consolidating this case with the two other cases and hearing oral argument, the trial court issued a decision on August 27, 2019, vacating the order of revocation and remanding the case to ODJFS with an instruction to reinstate Shiloh's license. ODJFS timely appealed from the trial court's decision.

## C.  Dixie

**{¶ 41}** The third center, Dixie, received a provisional license on September 22, 2014.   As was indicated, centers that are provisionally licensed must respond to all non-compliances.   In addition, ODJFS must consider whether a center has had serious risks or repeat non-compliances and assess whether the center is moving in a direction where it is will be compliant with the agency's rules.

**{¶ 42}** For this revocation, the period involved was between September 22, 2014 and October 5, 2016.   Rhonda was the initial administrator; the first inspection that occurred after the new administrator, Tanya Hood, was hired, was in February 2016. Dixie Tr. at p. 221.   During the relevant time period, compliance inspections occurred on December 10, 2014, May 21, 2015, August 18, 2015, February 19, 2016, and October 5, 2016, and a complaint inspection took place on May 10, 2016.   *Id.* at pp. 137, 150, 154, 163, 168, and 171.

**{¶ 43}** Baber was the licensing specialist the entire time, and Dixie's complaints about her began during the pre-licensing period.   *Id.* at p. 83.   As a result, Baber's supervisor, Paull, accompanied Baber on most inspections that were done.   *Id.* at pp. 85-86.   Paull concluded that Baber was doing everything that was expected of her, and did not feel that Baber was purposely looking for a reason to revoke Dixie's license.   *Id.* at pp. 82-83.

**{¶ 44}** During the provisional licensing period in question, Dixie accumulated 87 non-compliances and two serious risk points.   Ex. 2 at pp. 487-520.   Paull recommended revocation because Dixie was not responding to the non-compliances.

Dixie Tr. at pp. 85-86. The major issue was the failure to respond to the non-compliances. Underlying issues with repeat non-compliances for certain rules also existed. According to Paull, Dixie was right on the cusp of the serious risk points and under the rules, she could not amend a center's provisional license to a full license if a center refuses to respond to non-compliances. *Id.* at p. 92. Again, Dixie did not appeal to either Paull or Baber from any non-compliance findings.

{¶ 45} While the revocation letter only listed 13 violations, there were seven violations on December 10, 2014, 12 violations on May 15, 2015, 17 violations on August 8, 2015, six violations on February 2, 2016, one violation (a serious risk ratio violation) during a complaint inspection on May 10, 2016, and 16 violations on October 5, 2016. See Ex. 5 at pp. 595-697; Ex. 6, pp. 608-620; Ex. 7, pp. 621-636; Ex. 8, pp. 637-645; Ex. 9, p. 646, and Ex. 10, pp. 648-662. There were repeated violations of matters like lack of documentation of criminal background checks and updates of criminal non-convictions, and lack of medical information for children. Dixie Tr. at pp. 139-140, 147-148, 151-152, 159-161, and 164-166, Dixie also failed to have updated fire and vehicle inspection reports on file. *Id.* at pp. 156 and 158.

{¶ 46} According to Baber, Dixie never responded to or fully addressed the non-compliances in the inspection reports for December 10, 2014, May 21, 2015, August 18, 2015, February 2, 2016, May 10, 1016, and October 5, 2016. Not a single compliance was complete. Dixie Tr. at pp. 149-150, 154, 162, 168, 171, 172, and 180; Ex. 12 at pp. 666-673.

{¶ 47} According to Baber, Dixie's responses could generally be characterized as not fully compliant. She stated that Dixie "wouldn't respond by the required deadlines

and inspection reports. When they would respond, it would be incomplete statements sometimes, so if something required sending copies, the copies wouldn't be attached, or if it was something that talked about submit your corrective action plan on how you are going to correct the noncompliance, it might be Keyauna never asked for it, or it would be it was on file but it was somewhere else, not really addressing what the problem was, how you corrected it, and how you are going to make sure it doesn't happen again." *Id.* at p. 173.

**{¶ 48}** On October 21, 2015, Baber sent an email to Dixie because it had not responded to the August 18, 2015 inspection report. *Id.* at p. 161. The email referred Dixie to the report, which described what it needed to do and the prior deadline (September 17, 2015) for submitting any required information, materials, or plans. The email also referenced the initial license letter that Dixie received in September 2014 and stressed that a regular license could not be obtained at the end of the provisional period unless Dixie had complied with the rules. *Id.*; Ex. 11, p. 665.

**{¶ 49}** Subsequently, in December 2015, ODJFS had an in-office meeting with Dixie to discuss the compliance issues that were not being addressed. A previously noted, this meeting also focused on Salem. Regarding the compliance responses, many times Dixie had said that ODJFS representatives did not see what they saw, or that a violation did not happen. ODJFS explained these were not appropriate responses, and that if Dixie felt that was the case, it should have appealed the inspections. Dixie Tr. at p. 89. At that time, Dixie was told that if corrective action plans were not submitted, it could not obtain a full license. *Id.* at 91.

**{¶ 50}** Paull first recommended revocation in September 2016, but enforcement

asked her to give Dixie one more monitoring inspection. Once that was done, compliance was still the same, and there was a lack of a correction plan. As a result, Paull again recommended revocation on March 20, 2017. *Id.* at pp. 90-91; Ex. 13 at p. 674.

**{¶ 51}** On May 22, 2017, ODJFS sent Dixie a notice of opportunity to request a hearing concerning the proposed revocation, and Dixie then asked for a hearing. Dixie Tr. at p. 487. After hearings were held on October 12 and 13, 2017, the hearing examiner issued a report and recommendation on December 21, 2017, recommending that Dixie's provisional license be revoked. *Id.* at pp. 731-39. Dixie then filed objections, which the ODJFS Director rejected on March 26, 2018. The Director, therefore, revoked Dixie's license on March 26, 2018.

**{¶ 52}** On April 4, 2018, Dixie filed an administrative appeal with the trial court. After consolidating this case with the two other pending cases and hearing oral argument, the trial court issued a decision on August 27, 2019, vacating the order of revocation and remanding the case to ODJFS with an instruction to reinstate Dixie's license. ODJFS has timely appealed the trial court's decision.

## II. Misapplication of R.C. 119.12

**{¶ 53}** Because ODJFS has filed essentially the same assignments of error and same arguments in all three cases, we will simply use the assignments of error alleged in the Shiloh brief. The First Assignment of Error is as follows:

> The Lower Court Misapplied R.C. 119.12 When Reversing the
> Adjudication Order.

{¶ 54} Under this assignment of error, ODJFS contends that the trial court incorrectly identified the issue as whether there was reliable, substantial, and probative evidence that supported the administrative decision that revocation was "necessary." ODJFS contends that the proper standard, instead, is simply whether the order was supported by sufficient evidence; if so, the decision should have been affirmed. Additionally, ODJFS maintains that the trial court improperly considered extenuating circumstances such as the impact of the closure on the community.

{¶ 55} In vacating the ODJFS's decision in all three cases, the trial court did not consider the individual evidence about each center. Instead, the court stated:

> The Court notes that the agency's decision is to revoke appellant's operator's license despite years of providing childcare. Thus, the examination of the evidence with respect to reliability, probativeness, and substantiality is directed at this most extreme decision, ending True Care's service to the community in Dayton, Ohio. * * * There are no allegations that any child was abused. The allegations of neglect were minor and True Care took appropriate action.

Decision, Entry and Order ("Order"), pp. 2-3.

{¶ 56} The trial court further observed that:

> On appeal to this Court, the issue is whether the exercise of that authority [to revoke an operator's license] is supported by reliable, probative, and substantial evidence. The Court finds that only rule violations that are deemed to be "serious" are reliable to support revocation (loss of license) and the "paper" violations are not probative of the necessity

that operations under a duly issued license must be terminated. Such violations do not have substantial weight, i.e., importance and value, sufficient to support revocation. There is no evidence of a continuing practice of violating "serious" rules that are directly designed to prevent physical or emotional harm to children at the center. The few "serious" violations referenced at oral argument were explained and promptly addressed to the satisfaction of the specialist at the time. They do not remain reliable, probative, or substantial evidence months or years later.

*Id.* at p. 3.

{¶ 57} In administrative appeals under R.C. 119.12(M), a trial court "may affirm the order of the agency complained of in the appeal if it finds, upon consideration of the entire record and any additional evidence the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law." This type of evidence is defined as follows: " '(1) "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) "Substantial" evidence is evidence with some weight; it must have importance and value.' " *Bartchy v. State Bd. of Edn.*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, ¶ 39, quoting *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571, 589 N.E.2d 1303 (1992).

{¶ 58} In *Bartchy*, the court stated that in reviewing agency decisions under Chapter 119, common pleas courts must "conduct two inquiries: a hybrid factual/legal inquiry and a purely legal inquiry. As to the first inquiry, 'the common pleas court must

give deference to the agency's resolution of evidentiary conflicts, but "the findings of the agency are by no means conclusive." * * * "Where the court, in its appraisal of the evidence, determines that there exist legally significant reasons for discrediting certain evidence relied upon by the administrative body, and necessary to its determination, the court may reverse, vacate, or modify the administrative order." ' " *Id.* at ¶ 37, quoting *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 470-471, 613 N.E.2d 591 (1993), quoting *Univ. of Cincinnati v. Conrad* , 63 Ohio St.2d 108, 111, 407 N.E.2d 1265 (1980). The Supreme Court of Ohio has interpreted the precedent in *Conrad* " 'to mean that an agency's findings of fact are presumed to be correct and must be deferred to by a reviewing court unless that court determines that the agency's findings are internally inconsistent, impeached by evidence of a prior inconsistent statement, rest upon improper inferences, or are otherwise unsupportable.' " *Id.*, quoting *Ohio Historical Soc.* at 471.

{¶ 59} Appellate court review "is more limited than that of a trial court reviewing the same order. It is incumbent on the trial court to examine the evidence. Such is not the charge of the appellate court. The appellate court is to determine only if the trial court has abused its discretion." *Rossford Exempted Village School Dist. Bd. of Edn. v. State Bd. of Edn.*, 63 Ohio St.3d 705, 707, 590 N.E.2d 1240 (1992). " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). However, most abuses of discretion "will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary."

*Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 60} In the case before us, the trial court did not conclude that the findings of ODJFS were internally inconsistent, were impeached by inconsistent statements, rested on improper inferences, or were otherwise unsupportable. Instead, the trial court made its own finding that the violations were only "paper" issues and did not justify closing centers that provided a service to the community. The reasoning behind the trial court's statements is unclear, and they are not supported by the administrative record.

{¶ 61} As a preliminary matter, the trial court de-emphasized the seriousness of physical abuse of children because there was "no evidence of a continuing practice of violating 'serious' rules that are directly designated to prevent physical and emotional harm to children at the center." Order at p. 3. We disagree that a continuing practice is required and that the centers lacked a pattern of violating serious risk rules.

{¶ 62} For example, investigation of a December 2, 2016 complaint about Salem revealed that a childcare staff member who was upset that a child had transitioned into her classroom admitted to snatching the child by the arm. Salem Tr. at p. 246. The same investigation indicated that teachers withheld food from children who were not listening and placed two-year old children alone in a restroom as punishment for misbehavior. *Id.* at pp. 248 and 249.

{¶ 63} Also, an investigation of a complaint about Shiloh in July 2015 disclosed that a staff member had dragged a child by the arm and slammed the child down in a chair. An instance of neglect also occurred at Shiloh on January 1, 2014, when a sleeping child was left on a bus in cold weather for 45 minutes. *Id.* at p. 148. MCCS

substantiated neglect in that situation. *Id.* at p.151.

{¶ 64} Moreover, as the statement of facts indicates, many violations were not just minor or "paper" violations, and even where they involved documentation failures, the reason for the documentation was to protect the safety and welfare of children. For example, failure to document that criminal background checks were conducted or to update statements of non-conviction risks exposing young children to persons who may have engaged in behaviors that disqualify them from caring for children. In addition, even where True Care knew of potentially disqualifying criminal offenses, its centers did not properly ascertain the results of the charges. These types of violations occurred repeatedly, and at times involved more than one employee. *See* Salem Tr. at pp. 160-161 and 63-164 (March 24, 2014 and February 25, 2016); Shiloh Tr. at pp. 233-236, 250-252, 272-275, 283, and 311 (April 4, 2015; June 19, 2015; July 28, 2015; April 20-21, 2016; and June 26, 2016); Dixie Tr. at pp. 139-140, 153, 159, 164-165, and 167 (December 10, 2014; May 21, 2015, August 18, 2015; and February 2, 2016).

{¶ 65} Criminal background checks are deemed so important that "[e]xcept as provided in rules adopted under" R.C. 5104.013(F), "[t]he director of job and family services * * * shall refuse to issue a license to or approve a center * * * and shall revoke a license or approval, * * * if a person for whom a criminal records check was required under division (B)(1)(a) to (B)(1)(e) of this section has been convicted of or pleaded guilty to any of the violations described in division (A)(5) of section 109.572 of the Revised Code." R.C. 5104.013(B)(5)(a).[7] Accordingly, we can find no sound reasoning for the

---

[7] R.C. 5104.013(F) does not apply here, as it contains instructions for obtaining criminal background checks by day camps, not child daycare centers. *See* R.C. 5104.01(J) and (L).

trial court's observations.

{¶ 66} According to ODJFS, trial courts should be limited to determining whether a violation occurred, and if so, then revocation must be affirmed if reliable, probative, and substantial evidence supports the agency's finding. ODJFS Brief at p. 11, citing *Henry's Cafe, Inc. v. Bd. of Liquor Control*, 170 Ohio St. 233, 234, 163 N.E.2d 678 (1959). In *Henry's Cafe*, the court also stressed that "[t]here are no violations under extenuating circumstances, but only facts which do or do not constitute violations." *Id.* at 236.

{¶ 67} "It is well-settled that the reviewing court may not modify a sanction that is authorized by statute if the agency's order is supported by reliable, probative, and substantial evidence." *Hal v. Dept. of Education*, 10th Dist. Franklin No. 18AP-301, 2019-Ohio-5081, ¶ 39, citing *Henry's Cafe* at paragraphs two and three of the syllabus. *See also Cowans v. Ohio State Racing Comm.*, 2014-Ohio-1811, 11 N.E.3d 1215, ¶ 48 (10th Dist.); *Cantrell v. Ohio State Bd. of Emergency Med. Servs.*, 4th Dist. Scioto No. 06CA3078, 2007-Ohio-149, ¶ 20; W*omen's Med Ctr. of Dayton v. Dept. of Health*, 2019-Ohio-1146, 133 N.E.3d 1047, ¶ 43 (2d Dist.); *Zak v. Ohio State Dental Bd.*, 8th Dist. Cuyahoga No. 82692, 2004-Ohio-2981, ¶ 106.

{¶ 68} Here, there was no dispute that multiple violations occurred and that the agency had statutory authority to revoke an operator's license. Order at p, 3. Accordingly, the First Assignment of Error of ODJFS is sustained.

### III. Requirements for Revocation Under R.C. 5104.04

{¶ 69} ODJFS's Second Assignment of Error states that:

The Lower Court Misapplied R.C. 5104.04 When Reversing the

Adjudication Order.

{¶ 70} Under this assignment of error, ODJFS contends that the trial court erred in concluding that only "serious" rule violations are reliable enough to support revocation. ODJFS further argues that the court erred in imposing additional revocation requirements, in that a serious violation cannot support revocation if it has been addressed or if it occurred at some unspecified time in the past. As support, ODJFS emphasizes that revocation is statutorily permitted for "any" violation of law.

{¶ 71} In this regard, R.C. 5104.04(D) states that:

If the department finds, after notice and hearing pursuant to Chapter 119. of the Revised Code, that any applicant, person, firm, organization, institution, or agency applying for licensure or licensed under section 5104.03 of the Revised Code is in violation of any provision of this chapter or rules adopted pursuant to this chapter, the department may issue an order of denial to the applicant or an order of revocation to the center, type A home, or licensed type B home revoking the license previously issued by the department.[8]

{¶ 72} Former Ohio Adm.Code 5101:12-09(A)(1), which applied at the time of the violations, contained various grounds for revocation, including that "[a] center has failed to comply with the requirements of Chapter 5104 of the Revised Code and Chapter 5101:2-12 of the Administrative Code.[9] Both this statement and R.C. 5104.04 are quite

---

[8] R.C. 5104.04 was amended, effective October 17, 2019, but there was no change to R.C. 5104.04(D). *See* Am. Sub. H.B. 166, 2019 Ohio Laws File 10.

[9] *See* ODJFS Brief, Appendix C. The current version is found in R.C. 5101:2-12-05(A)(1), and is similar, stating that a license may be revoked if "[t]he center is not in

broad.

{¶ 73} ODJFS advocates that even a minor rule infraction is sufficient to support revocation. However, we need not decide that issue because that is not what occurred here. Shiloh had 205 non-compliances during the relevant time period. However, only 57 violations were included in the notice of revocation, meaning that many lesser non-compliances were omitted. *See* Shiloh Tr. at p. 126, Ex. 2 at p. 647, and Ex. 16 at pp. 883-887. Similarly, Salem had 53 non-compliances, with only 21 violations listed in the revocation notice; Dixie had 87 non-compliances and only 13 violations listed in the revocation. *See* Salem Tr., Ex. 2 at pp. 479-483 and Ex. 13 at pp. 598-599; Dixie Tr., Ex. 2 at pp 487-491 and Ex. 13 at pp. 674-687.

{¶ 74} Furthermore, the remaining grounds in former Ohio Adm.Code 5101:12-09(A) included matters like an owner's or administrator's guilty plea to certain offenses that are not eligible for rehabilitation; a center's false or misleading statements or reports to ODJFS; a center's failure to allow ODJFS access to the center; and failure to provide documentation within required time frames. ODJFS Brief at Appendix C. While some grounds are fairly substantial on their face, the documentation requirement is not. Given the content of the statute and regulation, there is no support for the trial court's conclusion that only "serious risks" are "reliable to support revocation * * *." Order at p. 3. The statute does not say or even imply this.

{¶ 75} As ODJFS notes, the trial court also stressed that "the few 'serious' violations referenced at [oral] argument were explained and promptly addressed to the

compliance with Chapter 5101:2-12 of the Administrative Code or Chapter 5104 of the Revised Code."

specialist at the time." *Id.* To the contrary, the ODJFS attorney was only asked by the court at oral argument which violations "bothered her the most." Oral Argument Transcript, p. 23. In response, she mentioned the incidences of corporal punishment and the incident where a child was left on the bus. She did not say that the "few" serious incidents were explained and promptly addressed to the specialist. In fact, during oral argument, ODJFS's attorney disputed that the rule violations of the centers had been corrected. *Id.* at p. 16.

{¶ 76} Nonetheless, attorney statements at oral arguments are not evidence. The record is the evidence. One example of a "serious risk" that was not corrected before Supervisor Taylor made the decision to revoke (and, indeed, for months afterward) was the latch on the gate at Salem. This was a serious risk because children could open the gate and escape to the parking lot, which fronted on a busy road. As previously noted, Taylor recommended on September 26, 2016, that Salem's license be revoked. The unsafe latch on the gate was observed at a June 9, 2016 inspection and was not fixed by the time of the December 2, 2016 inspection. Salem Tr. at pp. 83, 104, 136-138, 226, and 228-229. Between those dates, four other inspections had occurred.

{¶ 77} ODJFS also stresses that R.C. 5104.04 has no temporal limitation, and we agree. The trial court was concerned about past violations being used for revocation. However, ODJFS's witnesses testified, without contradiction, that they are able to look back over a five-year history to determine compliance. Nonetheless, in these cases, they only reviewed about two years. If a center has a history of failing to comply with rules, that is certainly relevant to the agency's decision whether to revoke its license. As the witnesses noted, what ODJFS is concerned about is a pattern or history of non-

compliances.    Salem Tr. at pp. 99-100, 178, 235; Shiloh Tr. at pp. 107, 126, and 127-128.

{¶ 78} For the reasons discussed, the trial court's decision concerning the revocation requirements under R.C. 5104.04 is based on unsound reasoning, and, therefore was an abuse of discretion.    Accordingly, the Second Assignment of Error is sustained.


IV.    Whether the Administrative Order Was Supported by Sufficient Evidence

{¶ 79} The final assignment of error that ODJFS asserts is that:

The Lower Court Erred in Finding that the Adjudication Order Was

Not Supported by Reliable, Probative, and Substantial Evidence.

{¶ 80} Under this assignment of error, ODJFS contends that the trial court erred in concluding that the revocations were not supported by reliable, probative, and substantial evidence.    In addressing this point, ODJFS points to many violations in the record and the evidence pertaining to these violations.    As we previously noted, " '(1) "Reliable" evidence is dependable; that is, it can be confidently trusted.    In order to be reliable, there must be a reasonable probability that the evidence is true.    (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue.    (3) "Substantial" evidence is evidence with some weight; it must have importance and value.' " (Citation omitted.)    *Bartchy*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, at ¶ 39.

{¶ 81} In view of the evidence discussed above, we conclude that the trial court abused its discretion by finding that the ODJFS administrative order was not supported

by reliable, probative, and substantial evidence. As noted, the trial court did not apply the correct analysis. In addition, the court did not consider the evidence as to each center separately. And finally, there was overwhelming evidence that the revocations were appropriate.

{¶ 82} At the hearing, Salem, Shiloh, and Dixie did present some witnesses. Specifically, they presented testimony from their administrators (Jones, Thomas, and Hood), as well as from Rhonda, Rhonda's husband, Anthony Holloway, and an employee, Christina Walker, who had worked at Shiloh from September 2014 to the beginning of September 2015. Thomas, Rhonda, and Walker complained about Baber's attitude. According to Walker, Baber told her in 2015 that Shiloh would be closing within a year, and advised her to get another job. Shiloh Tr. at p. 411.

{¶ 83} According to Thomas, she responded every time there was a complaint or compliance inspection, and there were no times when a response was due and she would not have the paperwork in order. *Id.* at pp. 423-424. Thomas also testified that she sent documents to ODJFS by fax and email. *Id.* at 424. Likewise, Rhonda and Hood (who started at Dixie in November 2015) testified that they had responded every time to items that were out of compliance and attached documentation whenever needed, although not always timely. This was also done by fax or email. Dixie Tr. at pp. 219, 225, 227-228, 251, 290-291, 295, 303, and 307-308. Rhonda, who sent many of the Dixie responses, stated that she was "extraordinarily diligent with her responses." *Id.* at p. 290.

{¶ 84} Despite these claims, none of the centers submitted documents to show that they responded to the inspection reports. Surely, if documents were sent by email or fax, documents would exist to prove the transmission. Why none were submitted for

the record is inexplicable.

**{¶ 85}** Jones did submit some photos of the outside of the Salem property, including the fence and latch, and he also discussed his investigation of some of the major complaints. In addition, Jones presented some letters from parents who were satisfied with their care at Salem. Again, however, Jones did not present documentation about his responses to complaints or inspection reports.

**{¶ 86}** Given the findings at the administrative level, the hearing examiner did not credit any of this testimony. In undertaking its "hybrid form of review, the Court of Common Pleas must give due deference to the administrative resolution of evidentiary conflicts." *Conrad*, 63 Ohio St.2d at 111, 407 N.E.2d 1265. In *Conrad*, the court commented that "when the evidence before the court consists of conflicting testimony of approximately equal weight the court should defer to the determination of the administrative body, which, as the factfinder, had the opportunity to observe the demeanor of the witnesses and weigh their credibility."

**{¶ 87}** It is noteworthy that True Care's witnesses primarily presented self-serving statements without supporting documentation. Furthermore, the gist of True Care's argument was that its centers did not have any problems until Baber appeared in 2014. However, the record contradicts this claim. Suermann, who had been with ODJFS for 10 years, was True Center's licensing specialist at different locations – Shiloh, Salem, and Main St. Suermann opened the program at Shiloh in 2012 and was there until spring of 2014, when Baber took over. Shiloh Tr. at pp. 139 and 141-142. As noted above, Suermann "had concerns with True Care's compliance history when she was their specialist" and "discussed it with them during various inspections." *Id.* at p. 178.

According to Suermann, True Care "had a lot of non-compliances in regard to record-keeping, accessibility to records, general cleanliness, or issues with staff."  *Id.* at pp. 178-179.

**{¶ 88}** Thus, the record indicates that the problems did not begin with Baber. More importantly, the history of non-compliance by these centers was significant.  To accept True Center's position that Baber was out to harm its centers would require one to conclude that both supervisors of the Dayton field office and five different licensing specialists were untruthful and engaged in some kind of conspiracy.  Again, the hearing examiner, who saw and heard all these witnesses, agreed with the revocations.  "A fact-finder ' "may believe or disbelieve any witness or accept part of what a witness says and reject the rest." ' "  *Hargrave Sitta-Bomberi v. Ohio Bur. of Motor Vehicles*, 2018-Ohio-513, 128 N.E.3d 750, ¶ 22, quoting *McKay Mach. Co. v. Rodman*, 11 Ohio St.2d 77, 82, 228 N.E.2d 304 (1967).

**{¶ 89}** In view of the preceding discussion, we conclude that the ODJFS's decision was supported by reliable, probative, and substantial evidence and that the trial court erred in vacating the administrative orders of ODJFS.  As a result, the Third Assignment of Error is sustained.

## V.  Conclusion

**{¶ 90}** All of ODJFS's assignments of error having been sustained, the judgment of the trial court is reversed.  This matter will be remanded to the trial court with instructions to reinstate the administrative orders issued by ODJFS in all three cases.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.


Copies sent to:

Johnna M. Shia
Theresa R. Dirisamer
Hon. Richard Skelton