[Cite as *Prude v. State Bd. of Edn.*, 2023-Ohio-1672.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

ARMOND PRUDE,                               :

    Plaintiff-Appellee,              :

                                            No. 111945

    v.                                      :

OHIO STATE BOARD OF EDUCATION, :

    Defendant-Appellant.             :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** VACATED AND REMANDED
**RELEASED AND JOURNALIZED:** May 18, 2023

---

Administrative Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-960440

---

### *Appearances:*

Baasten, McKinley & Co., L.P.A., Rachel M. Reight, and Anthony M. Dioguardi, II, *for appellee*.

David Yost, Ohio Attorney General, and Mary L. Hollern, Assistant Attorney General, Education Section, *for appellant*.

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant, the Ohio State Board of Education (the "Board"), appeals from the trial court's judgment reversing the Board's decision to permanently revoke appellee, Armond Prude's ("Prude"), four-year resident educator adolescence-to-

young-adult teaching license.  The Board raises the following assignments of error for review:

> 1.  The common pleas court abused its discretion in determining that the Board's decision was not supported by reliable, probative, and substantial evidence.
>
> 2.  The common pleas court abused its discretion in substituting its judgment for that of the Board in determining that appellee's conduct does not constitute conduct unbecoming an educator.
>
> 3.  The common pleas court abused its discretion in determining that the punishment the Board imposed on respondent was not in accordance with the law.

{¶ 2} After careful review of the record and relevant case law, we vacate the trial court's judgment and remand for further proceedings consistent with this opinion.

## I.  Procedural and Factual History

{¶ 3} Prude was issued a four-year resident educator adolescence-to-young-adult teaching license in 2016.  Shortly thereafter, Prude began his teaching career at Warrensville Heights High School ("WHHS").  During the 2018-2019 school year, Prude's daily schedule consisted of class periods that were 50 minutes long, a 25-minute lunch period, a 25-minute lunch-duty period, and two separate 50-minute planning periods.  During the 25-minute lunch-duty period, Prude's primary responsibility was to supervise the students during their lunch period.

{¶ 4} On November 7, 2018, while acting in the course and scope of his employment, Prude engaged in a physical altercation with a student ("Student 1") at WHHS during his lunch-duty period.  As a result of this incident, the

Superintendent of the Warrenville Heights City School District (the "school district"), Donald Jolly, II ("Jolly"), determined that it was necessary to make a recommendation to the Board that Prude's employment be terminated. Before the recommendation was made, however, Prude resigned from his employment for "personal reasons," effective January 31, 2019.

{¶ 5} On January 24, 2020, the Ohio Department of Education (the "Department") and the State Superintendent of Public Instruction, on behalf of the Board, notified Prude of its intent to determine whether to limit, suspend, revoke, or permanently revoke his four-year teaching license for engaging in conduct unbecoming of the teaching profession pursuant to R.C. 3319.31(B)(1). The Department issued two amended notices on January 30, 2020, and March 17, 2020. Each notice contained the following allegations:

> On or about November 7, 2018, you engaged in conduct unbecoming to the teaching profession when you engaged in a physical altercation with Student 1. Specifically, you pushed Student 1 numerous times, pushed Student 1 into a support structure, and pushed Student 1 into a window causing the window to break, resulting in lacerations to Student 1's hand and arm.
>
> Your acts, conduct, and/or omissions, as alleged in Count 1 above, constitute a violation of Section 3319.31(B)(1) of the Ohio Revised Code.

{¶ 6} Prude timely requested a hearing before an independent hearing officer pursuant to R.C. Chapter 119. Accordingly, an evidentiary hearing was held over the course of two days in October 2021.

{¶ 7} At the hearing, the Department entered various certified records of WHHS's investigation into evidence, including surveillance-video footage of Prude's interaction with Student 1 on November 7, 2018. The video footage was admitted into evidence without an objection.

{¶ 8} The video footage, which does not contain audio functions, shows that Prude was seated at a cafeteria table at approximately 12:58 p.m. Although Prude was attempting to eat his lunch at the time of the incident, he was not on his lunch break but was assigned to lunch duty. His responsibilities included, but were not limited to, monitoring the cafeteria and supervising the students therein.

{¶ 9} At approximately 1:00:10 p.m., Prude turned around and addressed Student 1, who had thrown cereal at Prude. Prude verbally reprimanded Student 1 and asked him to stop throwing food in the lunchroom. Prude confronted Student 1 a second time at approximately 1:01:55 p.m., after Student 1 threw food at him again. Following an exchange of words, Prude got up from his seat at approximately 1:02:07 p.m. He then chased down Student 1 and pushed him across the cafeteria floor and up against a support structure, which was just out of view of the surveillance camera. When Prude began walking back to his seat, Student 1 pushed Prude in the back with one arm. Prude did not retaliate and returned to his lunch table.

{¶ 10} The nature of the incident escalated when Student 1 followed Prude to his seat and continued his inappropriate and disruptive behavior. At approximately 1:02:27 p.m., Prude stood up from his seat and pushed Student 1 a second time. As

Prude turned his back to return to his table, Student 1 followed him. Prude then turned back around and pushed Student 1 three more times. Prude again returned to his seat and resumed eating his lunch. However, at approximately 1:03:13 p.m., Prude stood up a third time and swiftly approached Student 1, who was standing several feet away. Prude pushed Student 1 across the cafeteria floor and into a floor-to-ceiling window. The force of Prude's conduct caused the window to shatter, resulting in lacerations to Student 1's arm, hand, and finger.

{¶ 11} During its case, the Department first called Prude to testify as if on cross-examination. During his cross-examination, Prude confirmed that he was employed by WHHS at the time of the incident and had engaged in a physical altercation with Student 1 on November 7, 2018. Prude did not dispute that it was inappropriate for him to put his hands on a student and that he should have handled the situation differently. Nevertheless, Prude declined to characterize his conduct as "pushing" and continuously stated that he merely removed Student 1 from his personal space. For instance, when asked whether he disputed pushing Student 1 into a window causing the window to break, Prude responded:

> So I removed the student from my personal space, and his contact with
> the window — once he contacted the window, it broke.

(Tr. 19.) Prude further insinuated that he believed it was necessary to push Student 1 for his own safety, stating:

> [I] had no idea what [Student 1] was going to do because he was irate,
> yelling at me, and he was directly on me. And I had no idea what he
> was going to do, if he was going to hit me, what was going to happen,
> so I removed him from my personal space.

(Tr. 33.)

{¶ 12} The surveillance video was played in its entirety during Prude's cross-examination, and the Department asked him to describe the incident as it transpired. Specifically, Prude provided context to the situation and described the nature of the verbal statements made by Student 1 during the altercation. Prude stated that Student 1 threw food at him, "was yelling insults towards [him]," and called him a "b**** a** n*****." (Tr. 30.) Prude confirmed that Student 1's conduct caused him to stand up from his seat and "place [Student 1] against the structure" that was located across the cafeteria floor. (Tr. 30-31.) Prude testified that he warned Student 1 to never call him a derogatory name again. Thereafter, Student 1 continued to taunt Prude and use racial slurs. Again, Prude attempted to "redirect [Student 1] and remove him from [Prude's] personal space." (Tr. 34.) When Prude returned to his seat, Student 1 "continued with the racial slurs" and stated, "what the f*** are you going to do about it, p**** n*****." (Tr. 35.) This prompted Prude to push Student 1 across the cafeteria floor and into an exterior window. Prude noted that multiple staff members were in the cafeteria during the entirety of his interaction with Student 1, but failed to intervene or offer assistance.

{¶ 13} Kenya Hunt ("Hunt") testified that she has been employed by the school district for approximately six years and is currently the Director of Human Resources. Hunt confirmed that she was familiar with Prude and participated in the school district's investigation into the incident occurring on November 7, 2018. In the course of her investigation, Hunt reviewed the surveillance-video footage,

reviewed photographs of Student 1's injuries, interviewed Prude, certified various employment documents, and collected witness statements from Student 1, Student 2, Student 3, and WHHS employees, William Brewer, Derek Frye, and Samuel Malden.

{¶ 14} Hunt expressed that she was very concerned with Prude's conduct, stating:

> Number one, that child's safety was put in danger, and it could have been a lot worse in reference to the injuries sustained. I was concerned that one of our educators had in fact lost their cool in reference — you know, it looks like there's some going back and forth between Student 1 and Mr. Prude, but the educator was not able to refrain from getting physical with the student that was obviously joshing or doting something that he shouldn't have been doing.

(Tr. 66.) In this regard, Hunt opined that Prude's conduct violated the school district's internal policies governing student supervision and welfare. When asked what appropriate options were available to Prude under the circumstances, Hunt stated:

> Write a referral, contact security to have the student removed — we have security guards right outside the cafeteria — someone to remove the student if he was becoming disruptive or a distraction.

(Tr. 67.) Hunt further noted that there were "quite a few staff members" in the cafeteria at the time of the incident and that Prude made no effort to seek assistance or deescalate the situation. (Tr. 65.) Based on the available evidence, the school district intended to recommend that Prude be terminated from his employment.

{¶ 15} On cross-examination, Hunt clarified that although she spoke with Prude shortly after the incident, she did not personally participate in the interviews

with the other witnesses. The written statements from these individuals were obtained by the school district's supervisor of security. When asked to characterize Student 1's involvement in the incident, Hunt agreed that Student 1 exhibited disrespectful behavior towards Prude and engaged in conduct that was not appropriate. However, she reiterated that there should be no physical contact between an educator and a student and that there is nothing Student 1 could have said that would justify Prude pushing him into the window. She expounded on her position, stating:

> Just to be clear, students say things that adults may not agree with, but it is the responsibility of the adult to act in a manner that is always professional.

(Tr. 88.)

{¶ 16} Regarding the scope of her investigation, Hunt conceded that she did not include the notes from her interview with Prude in the official investigatory file. However, Hunt confirmed that aspects of Prude's version of the incident were consistent with the witnesses' observation that Student 1 was throwing food, using inappropriate language, and provoking Prude. (Tr. 91.) Hunt also conceded that she did not follow up with Student 2's written statement or otherwise seek clarification on what Student 2 meant by his statement that Student 1 "was saying inappropriate things" to Prude. Thus, Hunt agreed that she did not have any independent basis to know the exact words Student 1 had used.

{¶ 17} Superintendent Jolly testified that he was familiar with the altercation and the corresponding disciplinary investigation. Initially, Jolly expressed his belief

that this incident could have been avoided had another staff member intervened once the confrontation between Prude and Student 1 became heated. Nevertheless, Jolly emphasized that Prude's conduct was inappropriate and that "force or physical force in that situation was not warranted." (Tr. 119.) Noting the social and emotional abilities that distinguish a young student from a professional adult, Jolly testified that Prude should have attempted to deescalate the situation by involving colleagues, walking away, or obtaining administrative support. He explained his position as follows:

> So understanding that being in a school setting, understanding of how students can aggravate and say different things, it's just we have to deescalate the situation.

> I do understand that [Student 1] coming in personal space, but you sometimes have to remove them from your personal space, but when given multiple opportunities, you have to seek assistance because things will turn out like this if there's no interference, because the kid does not have these social, emotional abilities, and once these situations escalate you have to get help[.]

(Tr. 120.)

{¶ 18} Based on the evidence before him, Jolly opined that a recommendation of termination was warranted due to the severity of the incident and the nature of Student 1's injuries. Prior to a recommendation, however, Prude was allowed to resign in lieu of termination. When asked what he believed to be the most significant part of the interaction between Prude and Student 1, Jolly responded as follows:

> So I would say from my position, the whole interaction. So I'd have to look at it that at school you have other entities, because even though

[Prude's colleagues have] some culpability * * * by not intervening, you still had a teacher who had multiple opportunities to deescalate the situation. That's a given, and the end result resulted in a child being thrown through some glass, and potentially if you continue to watch that video, other children could have been injured by the glass falling.

So at that point, reviewing the totality of the situation, the opportunity to deescalate the situation, to seek help, at that point there was — I don't know how we could come back from that video. I didn't see any other option.

(Tr. 135.)

{¶ 19} On cross-examination, Jolly reiterated his belief that various circumstances contributed to the incident, including Student 1's disrespectful behavior, Prude's failure to deescalate the situation, Prude's colleagues' failure to intervene, and the lack of security in the cafeteria. Ultimately, however, Jolly testified that there was no "com[ing] back from that video" and he had no choice but to recommend Prude be terminated based on the severity of the incident. (Tr. 135.)

{¶ 20} On behalf of Prude, Pamela Barnes ("Barnes") testified that she has been employed as a teacher in the Warrensville Heights City School District for approximately 29 years. Barnes serves as the President of the Warrensville Heights Education Association and is required to attend meetings involving employee disciplinary matters. Barnes testified that she was familiar with Prude professionally, and views him as a "dedicated educator," and "a nice role model for [the] students in Warrensville." (Tr. 143.)

{¶ 21} In accordance with her responsibilities as the president of the teacher's association, Barnes actively communicated with Prude and the

administration during the investigatory process. Barnes testified that she met with Prude on the same afternoon of the incident. When asked to describe what she and Prude discussed during their meeting, Barnes stated:

> What happened during lunch duty between Mr. Prude and a student. He discussed he was upset, shaken, and he was nervous; shaken. He didn't know what to expect what to do.

(Tr. 145.)

{¶ 22} Barnes testified that Prude cooperated with the investigation but ultimately resigned after he was placed on paid administrative leave. Barnes also described the nature of her conversations with Jolly and his position that although Prude had a positive reputation in the school district, termination was appropriate based on the nature of Prude's conduct. She explained as follows:

> With the window breaking, the bookbag up against the window, and with it shattering, it made Mr. Jolly's hands tied, because when the glass shattered, it's a situation where people can get hurt, so his hands were actually tied because of the video, the broken glass.

(Tr. 150.)

{¶ 23} On cross-examination, Barnes conceded that it is not appropriate for a teacher to "get physical" with a student who throws food, uses profanity, or uses racial slurs. (Tr. 152.)

{¶ 24} Bridget Ewing ("Ewing") testified that she was employed as an intervention specialist in the school district from 2009-2018. Ewing was familiar with Prude and had the opportunity to observe him interact with his students. Ewing testified that Prude was a "team player" and had "established himself as a

professional" amongst his peers. (Tr. 158.) Ewing opined that Prude had a "positive impact on the students he taught" and would never intentionally harm a student or put a student in harm's way. (Tr. 167-168.)

{¶ 25} Ewing was also familiar with Student 1 and worked closely with him as his former teacher and case manager. Ewing described her experiences with Student 1 and believed that he has "lots of potential." (Tr. 161.) She testified, however, that Student 1 was often "defiant," and has been disciplined in the past for engaging in physical altercations on school property.

{¶ 26} Ewing was not employed at WHHS at the time of Prude's altercation with Student 1. However, she learned about the incident from a colleague. With respect to Student 1's conduct on November 7, 2018, Ewing testified that it is not appropriate for a student to throw food at a teacher, to use profanity towards a teacher, or to use racial slurs towards a teacher. Consistent with the testimony of her former colleagues, however, Ewing agreed that Prude's decision to push Student 1 was also inappropriate. Ewing explained that educators are required to "handle themselves professionally" even when a student behaves disrespectfully. (Tr. 173.)

{¶ 27} Candice Milton ("Milton") testified that she was formally employed by WHHS as an intervention specialist. Milton frequently collaborated with Prude in the classroom and viewed him as a "supportive" and "passionate" teacher. (Tr. 185.) According to Milton, Prude was well respected by his students and connected with them on a personal level.

{¶ 28} Milton was present in the cafeteria at the time of the incident on November 7, 2018. Milton stated that she was sitting in the back of the cafeteria with a colleague when she noticed that Prude seemed agitated. Milton began to move towards Prude when she observed "him and a student tussling and then boom, a window just collapsed in the cafeteria." (Tr. 189.) Milton was not questioned about her observations or otherwise asked to make a written statement.

{¶ 29} Milton agreed that Student 1's actions towards Prude were not appropriate. However, when asked on cross-examination what a teacher's appropriate response to a student throwing food or using profanity should be, Milton testified that the teacher should walk away, get security or an administrator, or write a referral. (Tr. 211-212.) She agreed that it would not be appropriate for the teacher to put their hands on the student or repeatedly push the student. Lastly, Milton testified that a student's use of racial slurs does not justify a physical response.

{¶ 30} Finally, Prude was called to testify on his own behalf as if on direct examination. Prude summarized his educational history, his employment history, and his job responsibilities at WHHS. He further described his professional relationship with Student 1. Prude testified that Student 1 was a student in his English 10 class. According to Prude, Student 1 was often absent from his class. When Student 1 was present, he was "consistently disruptive" and "gave [Prude] a hard time on a regular basis." (Tr. 230.)

{¶ 31} When asked to recount his perception of the incident, Prude maintained that his conduct was premised on Student 1's use of profanity and repeated racial slurs. Prude conceded that he "lost his cool" when Student 1 used the racial slur. (Tr. 236.) However, Prude continued to state that he "felt threatened" and believed that it was necessary to remove Student 1 from his personal space. Prude expressed that he was humiliated and violated by Student 1's words and conduct. Prude further felt like his colleagues did not provide him with the support and assistance he needed. Finally, Prude opined that issuing a referral, seeking help from another teacher, calling for security, or walking away from the situation would not have been effective methods for deescalating the altercation with Student 1. (Tr. 249-252.)

{¶ 32} Following the incident, Prude cooperated with the investigation process and was provided an opportunity to provide his side of the story. Prude testified that the administration was aware that Student 1 had used derogatory language during the incident, although the official investigation file did not include any references to the racial slurs.

{¶ 33} At the conclusion of his testimony, Prude conceded that his conduct was not appropriate for a licensed professional, stating:

> As a teacher, as an adult, I have to know better than to put my hands on a student, and that's not the type of person I am. I'm not a type of person in that video. I'm not an angry person, I'm not a violent person, and my students know that, my colleagues know that, people who hired me know that. It was just a moment where I let my emotions get the best of me, and that's not okay. It's not an excuse, but I just had one bad moment.

(Tr. 257-258.) Prude stated that if he was permitted to return to the classroom, "nothing like that would ever happen again because that's not the type of person I am. * * * I love teaching too much to jeopardize that." (Tr. 259.)

{¶ 34} On December 7, 2021, the Hearing Officer issued a Report and Recommendation, recommending that Prude's four-year resident educator adolescence-to-young-adult teaching license be revoked. The Hearing Officer further recommended that Prude be permanently ineligible to apply for any license issued by the Board, and that he not be permitted to hold any position in any school district in the state of Ohio that requires a license issued by the Board. In support of the recommendation, the Hearing Officer made the following findings:

> Aggravating Factors:
>
> 1. An aggravating factor is the nature and seriousness of [Prude]'s misconduct. It is an extremely serious matter when an educator causes physical harm to a student as was the case with [Prude] and Student 1. The manner in which the injury occurred is also serious because [Prude] chose to repeatedly engage physically with Student 1 when he had multiple opportunities to seek assistance or otherwise de-escalate the situation and failed to do so. Ohio Adm.Code 3301-73-21(B)(1).
>
> 2. [Prude]'s licensure will negatively impact the health, safety, and welfare of the school community. [Prude] provided no specifics as to how he could have handled the incident with Student 1 differently or how he would handle a similar situation in the future. He testified that the options for handling the situation with Student 1 suggested by other educators who testified would be ineffective. This leaves no clear picture as to what [Prude] would do if faced with a similar or otherwise challenging student misbehavior in the future. Therefore, [Prude]'s future conduct with disciplinary issues is a risk for negatively impacting students. Ohio Adm.Code 3301-73-21(B)(10).
>
> 3. The third aggravating factor is that [Prude] resigned his employment in lieu of termination. Ohio Adm.Code 3301-73-21(B)(12).

Mitigating Factors:

1. [Prude]'s age is a mitigating factor. [Prude] was approximately 31 years old at the time of his misconduct. He had 2.5 years of experience teaching full time at Warrensville HS and experience teaching in summer programs. Ohio Adm.Code 3301-73-21(B)(3).

2. [Prude] has not been previously disciplined by the Board or any other licensing entity. Ohio Adm.Code 3301-73-21(B)(11).

3. [Prude] has no previous educator misconduct or discipline on his employment record, and he received good teaching evaluations during the 2.5 years that he taught at Warrensville HS. Ohio Adm.Code 3301-73-21(B)(14).

{¶ 35} On February 16, 2022, the interim superintendent of public instruction, Dr. Stephanie K. Siddens, signed a Resolution wherein the Board permanently revoked Prude's teaching license. The Resolution provided, in relevant part:

WHEREAS the State Board of Education has considered the factors listed in Rule 3301-73—21 of the Ohio Administrative Code and has considered the Licensure Code of Professional Conduct for Ohio Educators, which contains standards for the teaching profession and provides guidelines for conduct that is unbecoming to the teaching profession:

Therefore, Be It RESOLVED, that the State Board of Education, pursuant to Ohio Revised Code 3319.31(B)(1), hereby REVOKES Armond J. Prude's four-year resident educator adolescence to young adult teaching license issued in 2016 based upon Mr. Prude engaging in conduct unbecoming of the teaching profession on or about November 7, 2018, when he engaged in a physical altercation with a student, specifically he pushed the student numerous times, pushed the student into a support structure, and pushed the student into a window causing the window to break, resulting in lacerations to the student's hand and arm. Further, the State Board of Education, in accordance with Ohio Administrative Code Rule 3301.73-22(A)(2)(b), orders Armond J. Prude be permanently ineligible to apply for any license, permit, or certificate issued by the State Board of Education.

{¶ 36} On March 9, 2022, Prude filed an administrative appeal of the Board's decision with the Cuyahoga County Court of Common Pleas. Prude argued the Board's decision was unreasonable, against the manifest weight of the evidence, demonstrated excessive punishment, and was contrary to law. Prude further argued that the Board's decision failed to adequately assess the relevant aggravating and mitigating factors. Accordingly, Prude asserted that the decision to permanently revoke his teaching license "[was] not supported by reliable, probative, and substantial evidence and [was] not in accordance with the law."

{¶ 37} On July 26, 2022, the common pleas court issued an opinion and order, reversing the Board's decision and ordering the Board to reinstate Prude's teaching credentials. The trial court concluded that the Board's decision was not based upon reliable, probative, and substantial evidence. Alternatively, the court determined that "even if the Board's decision [was] based upon reliable, probative, and substantial evidence, the punishment imposed on Mr. Prude was not in accordance with the law." In rendering its decision, the trial court made the following observations:

> The Hearing Officer's Report and Recommendation made to the Board was based on testimony provided by HR Director, Kenya Hunt, Superintendent Dr. Donald Jolly, and the video evidence in conjunction with the certified record. The HR Director did not conduct a thorough investigation of the incident, as she did not follow up with a single student interviewed by * * * the supervisor of security of Warrensville Heights High School. Director Hunt held an investigatory meeting with Mr. Prude, but did not include Mr. Prude's statement in the official investigatory file. Dr. Jolly testified that the responsibility to ask for assistance did not fall entirely on Mr. Prude. Dr. Jolly stated

that there was a sense of responsibility on the staff members that were watching the incident to take it upon themselves to intervene and assist Mr. Prude. The Board also relied on the video as being reliable, probative, and substantial evidence, however the videotape does not have any audio and there is a point in the video where both Mr. Prude and Student 1 are out of the frame, preventing the viewer from seeing the entire exchange.

{¶ 38} Relying on the Tenth District's decision in *Orth v. State Dept. of Edn.*, 10th Dist. Franklin No. 12AP-155, 2012-Ohio-4512, the trial court further noted that "teachers are called upon to make professional judgments every day and the reasonable exercise of such professional judgment cannot constitute a violation of R.C. 3319.31(B) as conduct unbecoming a classroom teacher."

{¶ 39} The Board now appeals from the trial court's judgment.

## II. Law and Analysis

### A. Standard of Review

{¶ 40} In an administrative appeal under R.C. 119.12, a common pleas court may affirm an administrative order "if it finds, upon consideration of the entire record and any additional evidence the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law." R.C. 119.12(M); *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993). Without such a finding, "it may reverse, vacate or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law." *Id.*

> (1) "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining

the issue. (3) "Substantial" evidence is evidence with some weight; it must have importance and value.

*Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571, 589 N.E.2d 1303 (1992).

{¶ 41} In conducting a review of the administrative record,

"the common pleas court must give deference to the agency's resolution of evidentiary conflicts, but 'the findings of the agency are by no means conclusive.' * * * 'Where the court, in its appraisal of the evidence, determines that there exist legally significant reasons for discrediting certain evidence relied upon by the administrative body, and necessary to its determination, the court may reverse, vacate, or modify the administrative order.'" *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 470-471, 613 N.E.2d 591 (1993), quoting *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 111, 407 N.E.2d 1265 (1980). * * * "[A]n agency's findings of fact are presumed to be correct and must be deferred to by a reviewing court unless that court determines that the agency's findings are internally inconsistent, impeached by evidence of a prior inconsistent statement, rest upon improper inferences, or are otherwise unsupportable." *Ohio Historical Soc.*, 66 Ohio St.3d at 471, 613 N.E.2d 591; *VFW Post 8586 v. Ohio Liquor Control Comm.*, 83 Ohio St.3d 79, 81, 697 N.E.2d 655 (1998).

*Bartchy v. State Bd. of Edn.*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, ¶ 37; *Buckeye Relief, L.L.C. v. State Bd. of Pharm*acy, 2020-Ohio-4916, 160 N.E.3d 767, ¶ 17 (8th Dist.). With respect to a purely legal inquiry, while the reviewing trial court must defer to the agency's findings of facts, it "must construe the law on its own." *Id*. at ¶ 38.

{¶ 42} Appellate review of the trial court's decision is more limited than the trial court's standard of review except as to issues of law. *Bartchy*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, at ¶ 41, 43. While the common pleas court must examine the evidence, "[s]uch is not the charge of the appellate court." *Bd. of*

*Edn. of Rossford Exempted Village School Dist. v. State Bd. of Edn.*, 63 Ohio St.3d 705, 707, 590 N.E.2d 1240 (1992). In reviewing the trial court's determination of whether an administrative order was supported by reliable, probative, and substantial evidence, this court's role is limited to determining whether the trial court abused its discretion. *Pons* at 621; *Roy v. Ohio State Med. Bd.*, 80 Ohio App.3d 675, 680, 610 N.E.2d 562 (10th Dist.1992).

{¶ 43} An abuse of discretion implies a decision that is unreasonable, arbitrary, or unconscionable. *State ex rel. DiFranco v. S. Euclid*, 144 Ohio St.3d 571, 2015-Ohio-4915, 45 N.E.3d 987, ¶ 13. A decision is unreasonable when "no sound reasoning process" supports that decision. *AAAA Ents. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). An abuse of discretion also occurs when a court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.).

{¶ 44} Absent an abuse of discretion on the part of the trial court, an appellate court may not substitute its judgment for the judgment of the board or a trial court. *Pons* at 621. However, "on the question of whether the agency's order was in accordance with the law, this court's review is plenary." *Leslie v. Ohio Dept. of Dev.*, 171 Ohio App.3d 55, 2007-Ohio-1170, 869 N.E.2d 687, ¶ 44 (10th Dist.), citing *Univ. Hosp., Univ. of Cincinnati College of Medicine v. State Emp. Relations Bd.*, 63 Ohio St.3d 339, 343, 587 N.E.2d 835 (1992).

## B. Conduct Unbecoming of the Teaching Profession

{¶ 45} In the first assignment of error, the Board argues the trial court abused its discretion in determining that its decision was not supported by reliable, probative, and substantial evidence. In the second assignment of error, the Board argues the trial court abused its discretion in substituting its judgment for that of the Board in determining that Prude's conduct did not constitute conduct unbecoming an educator. We address these assignments of error together because they are related.

{¶ 46} R.C. 3319.31(B)(1) permits the Board to "suspend, revoke, or limit a license that has been issued to any person" for "[e]ngaging in an immoral act, incompetence, negligence, or conduct that is unbecoming to the * * * person's position." *Haynam v. Ohio State Bd. of Edn.*, 6th Dist. Lucas No. L-11-1100, 2011-Ohio-6499, ¶ 32, citing *Poignon v. Ohio Bd. of Pharmacy*, 10th Dist. Franklin No. 03AP-178, 2004-Ohio-2709.

{¶ 47} The Ohio Administrative Code augments the statute's implementation with specific factors for determining conduct that is "unbecoming." Pursuant to Ohio Adm.Code 3301-73-21, the state board of education shall consider, but not be limited to, the following factors when evaluating conduct unbecoming under R.C. 3319.31(B)(1):

(1) Crimes or misconduct involving minors;

(2) Crimes or misconduct involving school children;

* * *; and

(8) Any other crimes or misconduct that negatively reflect upon the teaching profession, including sanctions and/or disciplinary action by another state educational entity or another professional licensing board or entity.

Ohio Adm.Code 3301-73-21(A).

{¶ 48} In conjunction with the Ohio Revised Code and the Ohio Administrative Code, the Licensure Code of Professional Conduct for Ohio Educators provides further guidance concerning an educator's professional responsibilities. "The Licensure Code serves 'as the basis for decisions on issues pertaining to licensure that are consistent with applicable law, and provides a guide for conduct in situations that have professional implications for all individuals licensed by the State Board of Education[.]'" *Sutton v. Ohio Dept. of Edn.*, 2017-Ohio-105, 80 N.E.3d 1238, ¶ 21 (8th Dist.), citing Licensure Code, p. 1.; *Robinson v. Ohio Dept of Edn.*, 2012-Ohio-1982, 971 N.E.2d 977, ¶ 18 (2d Dist.). The Licensure Code includes eight principles that define the "fundamental beliefs" required for Ohio educators and to a greater extent explains what constitutes "conduct unbecoming." Thus, as it serves our purposes, the Licensure Code further supplements the statutory and administrative standards and guides our assessment of "conduct unbecoming."

{¶ 49} Relevant to this appeal, the Licensure Code provides as follows:

1. Professional Behavior

Educators shall behave as professionals, realizing that their actions reflect directly on the status and substance of the education profession.

An educator serves as a positive role model to both students and adults and is responsible for preserving the dignity and integrity of the teaching profession and for practicing profession according to the highest ethical standards.

2. Professional Relationships with Students

Educators shall maintain a professional relationship with all students at all times, both in and out of the classroom.

An educator's responsibility includes nurturing the intellectual, physical, emotional, social, and civil potential of all students and providing a safe environment free from harassment, intimidation, and criminal activity. An educator creates, supports, and maintains an appropriate learning environment for all students and fulfills the roles of trusted confidante, mentor, and advocate for students' rights. An educator must serve as a champion against child abuse and be cognizant of student behaviors that suggest abuse or neglect.

Conduct unbecoming to the profession includes, but is not limited to, the following actions:

* * *

Provoking an altercation with or between students or engaging in a physical altercation with students that is not for the purpose of ensuring the health, safety, and welfare of students.

Failing to provide appropriate supervision of students, within the scope of the educator's official capacity, which risks the health, safety and welfare of students or others in the school community.

{¶ 50} Collectively, the foregoing provisions set forth a number of relevant factors to be considered in assessing whether a teacher has engaged in conduct unbecoming of the profession. These factors include, but are not limited to (1) misconduct involving minor, school children; (2) any misconduct that negatively reflects upon the teaching profession; (3) the failure to practice the teaching profession according to the highest ethical standards; (4) the failure to maintain a

professional relationship with all students, inside and outside the classroom; (5) engaging in a physical altercation with a student that is not for the purpose of ensuring the student's health, safety, and welfare; and (6) failing to provide appropriate supervision of students.

{¶ 51} With respect to these relevant factors, the Hearing Officer made the following conclusions of law in its Report and Recommendation to the Board:

10. The evidence in the hearing record establishes that [Prude]'s conduct involved a minor school child pursuant to Ohio Adm.Code 3301-73-21(A)(1) and (2).

11. The evidence in the hearing record establishes that [Prude]'s conduct in engaging in a physical altercation with Student 1 constitutes misconduct that negatively reflects upon the teaching profession pursuant to Ohio Adm.Code 3301-73-21(A)(8).

12. [Prude]'s conduct negatively reflects upon the teaching profession because he repeatedly pushed Student 1 in response to the student throwing food at him in the cafeteria and using profanity and racial slurs. [Prude] failed to de-escalate the situation by walking away, obtaining assistance from administrator's, staff or security, or writing a referral. Instead, [Prude] escalated the situation by engaging in an altercation with Student 1 culminating with [Prude] pushing Student 1 against a window that shattered and caused injury to Student 1.

{¶ 52} In support of its determination that Prude's conduct constituted conduct unbecoming to the teaching profession pursuant to R.C. 3319.31(B)(1), "which is a basis for the Board to revoke or permanently revoke [Prude]'s expired educator license," the Hearing Officer also cited Principles 1 and 2 of The Licensure Code, stating, in relevant part:

16. [Prude]'s conduct in engaging in a physical altercation with Student 1 that involved pushing Student 1 numerous times, pushing Student 1 into a support structure, and pushing Student 1 into a window causing

the window to break and resulting in lacerations to Student 1's arm, hand, and finger is a violation of Principle 1 of the Licensure Code because [Prude]'s conduct was not professional; he was not acting as a positive role model; and his conduct did not meet the requirements of preserving the dignity and integrity of the teaching profession.

\* \* \*

18. [Prude]'s conduct with Student 1 violates Principle 2 of the Licensure Code because engaging in a physical altercation with a student is not a professional relationship; [Prude] did not provide a safe environment free from intimidation for Student 1; and [Prude] did not fulfill the role of trusted mentor and advocate for students' rights when he engaged in a physical altercation with Student 1.

\* \* \*

20. [Prude]'s conduct constitutes conduct unbecoming pursuant to Principle 2(f) of the Licensure Code because [Prude] engaged in a physical altercation with Student 1 by pushing Student 1 numerous times[.]

21. [Prude]'s conduct was not for the purpose of ensuring the health, safety, or welfare of students such as protecting a student from himself/herself or others.

\* \* \*

23. [Prude]'s conduct constitutes conduct unbecoming pursuant to Principle 2(g) of the Licensure Code because he was assigned to lunch duty to help monitor students in the cafeteria. Instead of providing appropriate supervision, [Prude] engaged in conduct that risked a student's health, safety, and welfare when he reacted to Student 1's misbehavior by pushing him numerous times[.]

{¶ 53} As stated, the trial court rejected the findings of fact and conclusions of law issued in the Hearing Officer's carefully constructed, 30-page Report and Recommendation. The trial court reasoned that the Board's adoption of the Hearing Officer's recommendation was not based upon reliable, probative, and substantial

evidence. In reaching this conclusion, the trial court inferred that the evidence presented at the October 2021 administrative hearing was not trustworthy because (1) Hunt did not follow up with a single student interviewed by the school district's chief of security; (2) Hunt did not include notes from her initial conversation with Prude in the official investigatory file; (3) Superintendent Jolly agreed that Prude's colleagues had an obligation to intervene in the altercation and failed to do so; and (4) the surveillance video footage lacked audio functions; and (5) Prude and Student 1 briefly exited the video's frame of view, "preventing the viewer from seeing the entire exchange." As discussed in further detail in the third assignment of error, the trial court alternatively concluded that the punishment imposed on Prude was contrary to law because the Hearing Officer did not expressly "take into account mitigating factor [Ohio Adm.Code 3301-73-21(B)(5)], regarding Mr. Prude's conduct and work activity before and after the incident."

{¶ 54} On appeal, the Board argues the trial court abused its discretion by "completely disregarding the highly probative video evidence of [Prude]'s misconduct, failing to properly consider the very probative statements obtained from witnesses, and ignoring other evidence presented by the Board." The Board contends that the common pleas court "failed to apply the principle of administrative deference" and merely substituted its judgment for that of the Board in determining that Prude's conduct did not constitute conduct unbecoming an educator.

{¶ 55} The principle of administrative deference is well established:

> "The purpose of the General Assembly in providing for administrative hearings in particular fields was to facilitate such matters by placing the decision on facts with boards or commissions composed of [people] equipped with the necessary knowledge and experience pertaining to a particular field. * * *"

*Arlen v. State Med. Bd.*, 61 Ohio St.2d 168, 173, 194, 399 N.E.2d 1251 (1980), quoting *Farrand v. State Med. Bd.*, 151 Ohio St. 222, 224, 85 N.E.2d 113, 114 (1949). For this reason, trial courts

> "'must give due deference to an administrative interpretation formulated by an agency that has accumulated substantial expertise, and to which the General Assembly has delegated the responsibility of implementing the legislative command.'" *Bernard v. Unemp. Comp. Rev. Comm.*, 136 Ohio St.3d 264, 267, 2013-Ohio-3121, ¶ 12, 994 N.E.2d 437, quoting *Swallow v. Industrial Comm. of Ohio*, 36 Ohio St. 3d 55, 57, 521 N.E.2d 778 (1988). *See also Minges v. Ohio Dept. of Agriculture*, 2013-Ohio-1808, 990 N.E.2d 662, ¶ 16 (10th Dist.) ("Ordinarily courts accord deference to an agency's interpretation of rules that the agency is required to administer."). "However, if an agency's interpretation is unreasonable, then courts need not defer to that interpretation." *Id.* at ¶ 12. *See also State ex rel. Gill v. School Emps. Retirement Sys. of Ohio*, 121 Ohio St.3d 567, 2009-Ohio-1358, 906 N.E.2d 415, ¶ 28, quoting *Northwestern Ohio Bldg. & Constr. Trades Council v. Conrad*, 92 Ohio St.3d 282, 287, 750 N.E.2d 130 (2001) ("'A court must give due deference to the agency's reasonable interpretation of the legislative scheme.'").

*Orth v. State*, 10th Dist. Franklin No. 14AP-19, 2014-Ohio-5353, ¶ 16, quoting *Bernard v. Unemp. Comp. Rev. Comm.*, 136 Ohio St. 3d 264, 2013-Ohio-3121, 994 N.E.2d 437, ¶ 12; *see also Sutton*, 2017-Ohio-105, 80 N.E.3d 1238, at ¶ 30 (8th Dist.).

{¶ 56} After careful consideration, we find the trial court abused its discretion in concluding that the Board's decision that Prude engaged in conduct unbecoming of an educator was not supported by reliable, probative, and substantial evidence. Whether this court agrees or disagrees with the Board's ultimate decision

to permanently revoke Prude's teaching license is immaterial. Rather, our conclusion is premised on the principle of administrative deference and our determination that the trial court merely substituted its judgment for that of the Board without a reasonable factual or legal basis to do so.

{¶ 57} In this appeal, Prude correctly states that the trial court was permitted to appraise the credibility and weight of the evidence presented at the administrative hearing. *See Care Circle L.L.C. v. Ohio Dept. of Mental Health & Addiction Servs.*, 8th Dist. Cuyahoga No. 108454, 2020-Ohio-1382, ¶ 32. However, in the absence of legally significant reasons for discrediting certain evidence, the trial court was not permitted to ignore undisputed facts or second guess the Board's reasonable interpretation of the applicable statutes and administrative rules. Here, the record unambiguously established that Prude engaged in a physical altercation with a minor student while acting in the course and scope of his employment as an educator with the Warrensville Heights City School District. Prude pushed the student on three separate occasions and failed to deescalate the situation despite having ample opportunity to do so. It is equally undisputed that Prude forcefully pushed the student into a structural pole and into a glass window, causing the window to shatter. Prude's unprofessional and unethical conduct resulted in injuries to Student 1 and further risked the health, safety, and welfare of the other students he was responsible for as a lunch-duty supervisor. As Prude conceded during his testimony at the administrative hearing, he simply "lost his cool" and engaged in conduct that he himself characterized as being inappropriate for a

licensed professional, stating, "As a teacher, as an adult, I have to know better than to put my hands on a student[.]" (Tr. 357-358.)

{¶ 58} The foregoing facts are not disputed and unquestionably demonstrated that Prude engaged in conduct unbecoming of the teaching profession as contemplated under R.C. 3319.31(B)(1), Ohio Adm.Code 3301-73-21(A)(1), (2), and (8), and the Licensure Code. While there were mitigating circumstances relating to Student 1's own inappropriate behavior and Prude's colleagues' failure to intervene or assist in the altercation, these facts did not negate or otherwise justify Prude's response and his decision to physically engage a minor.

{¶ 59} In the absence of evidence in this record to suggest that the Board's findings "are internally inconsistent, impeached by evidence of a prior inconsistent statement, rest upon improper inferences, or are otherwise unsupportable," we find the trial court abused its discretion by merely substituting its judgment for that of the Board and by relying on trivial portions of the record to reach an outcome the court independently deemed more appropriate. *See True Care Early Learning Ctr. v. Ohio Dept. of Job & Family Servs.*, 2020-Ohio-954, 152 N.E.3d 1017, ¶ 60 (2d Dist.) ("In the case before us, the trial court did not conclude that the findings of ODJFS were internally inconsistent, were impeached by inconsistent statements, rested on improper inferences, or were otherwise unsupportable. Instead, the trial court made its own finding[s] that * * * are not supported by the administrative record.").

{¶ 60} In reaching this conclusion, we find the trial court failed to set forth a plausible factual or legal basis to discredit the contents of the surveillance-video footage. Significantly, the authenticity or reliability of the video was not contested at the administrative hearing and the exhibit was introduced into evidence without an objection. The video was played on numerous occasions during the hearing and each witness, including Prude, was provided with an opportunity to describe the events as they unfolded. Although the video did not contain audio functions, the nature and cause of the altercation was not disputed and there was ample testimony supporting Prude's contention that Student 1 taunted Prude and repeatedly used inappropriate language and racial slurs during the encounter. Additionally, the fact that Prude and Student 1 exited the frame of view for less than ten seconds did not negate the nature of their confrontation or the remaining video footage that clearly depicts Prude push Student 1. In particular, the video footage unambiguously shows Prude stand up from his seat and push Student 1 a significant distance across the cafeteria floor and into a floor-to-ceiling window. There is simply no evidence impeaching the authenticity or reliability of the video or its depiction of Prude's conduct during the physical altercation.

{¶ 61} Moreover, we find the trial court's reliance on certain aspects of Hunt and Jolly's cross-examination testimony did not negate the reliability of the remaining evidence establishing Prude's conduct. The court's piecemeal approach further ignored Hunt and Jolly's ultimate opinions that Prude engaged in inappropriate and unprofessional conduct.

{¶ 62} In this case, Hunt was questioned at length about her investigatory process and her decision to not follow up with the students and staff members that provided written statements. Hunt explained that the inappropriate nature of Student 1's comments and actions towards Prude was well established and that further details on this issue was unnecessary. When pressed on cross-examination to explain why she did not follow up with the eyewitnesses, Hunt testified as followed:

> I believe that at the time we had everything we needed, in addition to the statements and the video. * * *Just to be clear, students say things that adults may not agree with, but it's the responsibility of the adult to act in a manner that is always professional.

(Tr. 87-88.)

{¶ 63} In addition, although Hunt conceded that she failed to include her notes from her initial meeting with Prude in the official investigatory file, the record reflects that Prude declined to make a full statement during the investigatory process until he consulted with legal counsel. Moreover, Prude was provided ample opportunity during the administrative hearing to explain his side of the story and the circumstances that caused him to engage in a physical altercation with Student 1 on November 7, 2018. The contents of Hunt's notes from her first conversation with Prude in the days following the incident would have been cumulative to and/or less detailed than Prude's own testimony.

{¶ 64} With respect to Superintendent Jolly's testimony, it is clear that he believed the outcome of the physical altercation between Prude and Student 1 could

have been avoided had another staff member intervened and diffused the situation. However, Jolly clarified that the inaction of the other teachers on duty in the cafeteria did not negate or otherwise justify Prude's inappropriate and unprofessional conduct. Of primary significance to this case, Jolly emphasized that that physical force was not warranted, that Prude did not attempt to deescalate the situation, and that an educator simply cannot engage in and escalate a physical altercation with a disruptive student. Jolly opined that based on the unambiguous nature of Prude's conduct, as depicted on the surveillance-video footage, he was obligated to recommend that Prude be terminated from his position.

{¶ 65} Finally, we are equally unpersuaded by the trial court's reliance on the legal principles articulated by the Tenth District in *Orth v. State Dept. of Edn.*, 10th Dist. Franklin No. 12AP-155, 2012-Ohio-4512. In *Orth*, a teacher with no history of misconduct or disciplinary actions had her teaching license permanently revoked by the Department for conduct unbecoming the teaching profession following an altercation with a student who was not yet in kindergarten. The court summarized the pertinent facts as follows:

> On October 22, 2009, [Orth] restrained a student who was out of control. As a result of the restraint, the student ended up with scratches and red marks on his lower back and buttocks. [Orth] did not have first aid administered immediately, but allowed the child to proceed home on a school bus. Once home, the child's mother gave him a bath and applied Neosporin.
>
> Orth did not immediately fill out the paperwork reporting her encounter with the student and his minor injuries. She began a report, but interrupted its preparation to teach her afternoon students. She did not finish the report after her last students left for the day. The

paperwork was intended for the school principal, but the principal was out of the building the next day, which was a Friday. As a result, the report was not submitted to the principal until the next Monday.

Based on these facts, charges were filed with [the Department], alleging that Orth should lose her teaching license for violating R.C. 3319.31(B)(1)[.]

*Id.* at ¶ 3-5.

{¶ 66} On appeal, the Tenth District vacated the trial court's judgment, finding the court abused its discretion in finding the administrative decision was supported by reliable, probative, and substantial evidence. In reaching this conclusion, the reviewing court determined that Orth's decision to allow the student to get on the school bus without administering first aide did not amount to conduct unbecoming of the teaching profession. The court found that "Orth made a reasonable professional judgment that resulted in better treatment for the [student's] scratches and removed the risk of another uncontrollable fit." *Id.* at ¶ 13. The court explained that

[t]eachers are called upon to make professional judgments every day and the reasonable exercise of such professional judgment cannot constitute a violation of R.C. 3319.31(B) as conduct unbecoming a classroom teacher.

*Id.* at ¶ 14.

{¶ 67} The *Orth* Court further questioned whether Orth's restraint was appropriate and whether the scratches to the student were accidentally inflicted. The reviewing court conceded that "causing harm to a student is not consistent with maintaining reasonable order in the classroom" and that teachers cannot engage in

the "unreasonable physical restraint of a student." *Id*. at ¶ 17. However, the court inferred that the harm caused by physical restraint may be reasonable if the "student is a risk to himself or herself and to others in the classroom, including the teacher." *Id.*

{¶ 68} After careful consideration, we find the facts in *Orth* to be highly distinguishable from those presented in this case. We agree with the sentiments in *Orth* that teachers are often presented with the "most trying of circumstances" on a day-to-day basis. *Orth* at ¶ 17. However, unlike the circumstances presented in *Orth*, there is no evidence in this case to suggest that Prude's conduct was accidental or the product of professional judgment that was intended to ensure the health, safety, and welfare of his student. Rather, the evidence adduced at the administrative hearing established that Prude lost his temper and intentionally engaged in an unreasonable physical altercation that went beyond Prude's duty to maintain order in the lunchroom. Collectively, the educators and school administrators who testified at the hearing confirmed that Prude did not attempt to deescalate the situation despite having the opportunity to do so. Prude returned to his seat two separate times before making the conscious decision to reinitiate the physical altercation by pushing Student 1 into the cafeteria window. Perhaps most significantly, each witness further agreed that it was not professional or appropriate for a teacher to get physical with a student because the student threw food, used foul language, or used racial slurs. Prude did not dispute the testimony of his colleagues but merely stated that he intended to do better if given a second opportunity. In

fact, Prude acknowledged in his post-hearing brief that his conduct on November 7, 2018, likely warranted "some degree of discipline." Rather than arguing that the evidence did not support the conclusion that he engaged in conduct prohibited by R.C. 3319.31(B), Prude merely requested that the Hearing Officer's recommendation "not rise to the level of the permanent revocation of [his] teaching license."

{¶ 69} Consistent with the foregoing, we find the evidence relied on by the trial court constituted an unreasonable and arbitrary attempt to disregard the reliable, probative, and substantial evidence supporting the Board's decision that Prude's acts of pushing a student multiple times in the span of several minutes, resulting in a shattered window that cut a student's arm, hand, and finger, amounted to conduct unbecoming to the teaching profession. Accordingly, we find "no sound reasoning process" supports the trial court's decision. *See True Care Early Learning Ctr.*, 2020-Ohio-954, 152 N.E.3d 1017, at ¶ 65 (2d Dist.).

{¶ 70} The first and second assignments of error are sustained.

## C. Scope of Punishment

{¶ 71} In the third assignment of error, the Board argues the trial court abused its discretion in determining that the punishment imposed on Prude was not in accordance with the law. The Board contends that it properly considered the applicable mitigating factors and was permitted to permanently revoke Prude's teaching license pursuant to the authority afforded to it under R.C. 3319.31(B)(1), Ohio Adm.Code 3301-73-21(B), and Ohio Adm.Code 3301-73-22(A)(2)(b).

{¶ 72} As previously stated, R.C. 3319.31(B)(1) permits the state board of education to "suspend, revoke, or limit a license that has been issued to any person" for "[e]ngaging in * * * conduct that is unbecoming to the * * * person's position." If, as here, the Board finds a teacher has engaged in conduct unbecoming of the profession, then the Board may take the following mitigating and aggravating factors into consideration when determining a final action under R.C. 3319.31(B)(1):

(1) The nature and seriousness of the crime or misconduct;

(2) The extent of the person's past criminal activity or misconduct;

(3) The age of the person when the crime or misconduct was committed;

(4) The amount of time that has elapsed since the person's last criminal activity or misconduct;

(5) The conduct and work activity of the person before and after the criminal activity or misconduct;

(6) Whether the educator has completed the terms of his/her probation or deferred adjudication;

(7) Evidence of rehabilitation and evidence of whether the educator is amenable to rehabilitation;

(8) Whether the applicant is eligible for licensure pursuant to rule 3301-20-01 of the Administrative Code;

(9) Whether the person fully disclosed the crime or misconduct to the state board, the department or the employing school district;

(10) Whether licensure will negatively impact the health, safety, or welfare of the school community and/or statewide education community;

(11) Whether the educator has previously been disciplined by the state board of education or any other licensing entity, including, but not limited to, out-of-state licensing entities;

(12) Whether the school district or educational entity imposed any penalties, sanctions, or other conditions addressing the educator's professional conduct;

(13) Whether the educator has been employed in any capacity within a school district or educational entity after having a license, certificate, or permit revoked; and

(14) Any other relevant factor.

Ohio Adm.Code 3301-73-21(B).

{¶ 73} The Ohio Administrative Code further elaborates that once the state board revokes an educator's license

[t]he state board may order that the respondent whose license has been revoked shall be permanently ineligible to apply for any license issued by the state board and that the respondent shall no longer be permitted to hold any position in any school district in the state that requires a license issued by the state board.

Ohio Adm.Code 3301-73-22(A)(2)(b).

{¶ 74} In this case, the Hearing Officer made the following conclusions of law concerning the foregoing factors:

31. After full consideration of the record of the instant matter, the Hearing Officer finds that the evidence supports the Board's taking action pursuant to R.C. 3319.31(B)(1) to revoke [Prude]'s expired educator license based on the nature and seriousness of [Prude]'s conduct.

* * *

35. Based on a consideration of all evidence in the record, the Hearing Officer recommends permanent revocation of [Prude]'s educator license pursuant to Ohio Adm.Code 3301-73-22(A)(2)(b).

36. The Hearing Officer's recommendation of permanent revocation is based on the nature and seriousness of [Prude]'s misconduct and on the negative impact that [Prude]'s licensure would have on the health, safety, and welfare of the school community.

{¶ 75} The Board adopted the Hearing Officer's recommendation, expressly stating that it had considered all relevant factors under Ohio Adm.Code 3301-73-21 in rendering its decision to permanently revoke Prude's teaching license under R.C. 3319.31(B)(1) and Ohio Adm.Code 3301-73-22(A)(2)(b).

{¶ 76} Despite the clear language in the Board's resolution indicating that it carefully considered the applicable aggravating and mitigating factors before rendering its decision in this case, the trial court concluded that the punishment imposed on Prude was not in accordance with the law because the Hearing Officer did not consider his conduct and work activity under Ohio Adm.Code 3319-73-21(B)(5).

{¶ 77} Initially, it is important to note that Ohio Adm.Code 3319-73-21 provides that a trial court *may* take the aggravating and mitigating factors set forth under section (B) of the provision when determining the appropriate action under R.C. 3319.31(B)(1). (Emphasis added.) The rule is intended to provide the Board guidance. Relatedly, the Ohio Revised Code is silent on this issue and contains no language to suggest the consideration of the foregoing factors is mandatory or that the Board is required to make findings in support of its decision to suspend, revoke, or limit a teaching license. Thus, there is no persuasive authority to suggest the

Hearing Officer's primary reliance on the mitigating factors set forth under 3319-73-21(B)(3), (11), and (14) constituted an error of law.

{¶ 78} Moreover, and contrary to the court's conclusion, our review of the record reveals that the Hearing Officer did contemplate Prude's prior work performance and his lack of a disciplinary record when rendering its recommendation, stating:

> Respondent has no record of any discipline on his employment record with Warrensville SD prior to November 7, 2018.
>
> Respondent has no record of discipline from the Board of Education or any other licensing entity.
>
> Respondent received an overall rating of "skilled" on the majority of his teaching evaluations as well as some overall ratings of "developing" for the 2016-2017, 2017-2018, and part of the 2018-2019 school years.

{¶ 79} Finally, it is well established that a reviewing court may not modify a sanction that is authorized by statute if the agency's order is supported by reliable, probative, and substantial evidence. *Henry's Café, Inc. v. Bd. of Liquor Control,* 170 Ohio St. 233, 163 N.E.2d 678 (1959), paragraphs two and three of the syllabus. "As a practical matter, courts have no power to review penalties meted out by the commission. Thus, we have little or no ability to review a penalty even if it seems on the surface to be unreasonable or unduly harsh." *Goldfinger Ents., Inc. v. Ohio Liquor Control Comm.,* 10th Dist. Franklin No. 01AP-1172, 2002-Ohio-2770, ¶ 16; *Wolfe v. Accountancy Bd. of Ohio,* 2016-Ohio-8542, 79 N.E.3d 1261, ¶ 16 (10th Dist.) ("The determination of the appropriate sanction in an administrative hearing

is strictly for the agency."), citing *Reed v. State Med. Bd.*, 162 Ohio App.3d 429, 2005-Ohio-4071, 833 N.E.2d 814, ¶ 41 (10th Dist.).

{¶ 80} Because the Board's order is supported by reliable, probative, and substantial evidence, the trial court had no authority to modify the authorized sanction chosen by the Board merely because it believed the sanction was too harsh. Given the ample evidence of Prude's unprofessional conduct, the Board was entitled to exercise the discretion afforded to it under the Ohio Revised Code and the Ohio Administrative Code. Whether or not the trial court or this court agrees with the scope of the Board's penalty is immaterial under the well-established precedent of the Ohio Supreme Court. As eloquently stated by Superintendent Jolly, we recognize that teachers are frequently placed in stressful situations that far too often require them to confront disruptive and dangerous behaviors. Nevertheless, to the extent the trial court suggests the Board erred as a matter of law by permanently revoking Prude's teaching license, we find the trial court abused its discretion by either applying the wrong legal standard or misapplying the correct legal standard by relying on an erroneous finding of fact.

{¶ 81} The third assignment of error is sustained.

{¶ 82} The trial court's judgment is vacated. On remand the trial court is instructed to reinstate the Board's Resolution.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
ANITA LASTER MAYS, A.J., DISSENTS (WITH SEPARATE ATTACHED OPINION)

ANITA LASTER MAYS, A.J., DISSENTING:

{¶ 83} I respectfully dissent and would affirm the trial court's judgment that the record does not support permanent revocation of Prude's license. There is substantial evidence in the record that the state board did not take into consideration Prude's exemplary contributions to the lives of his students and to the profession during his two- and one-half-year teaching tenure as a mitigating factor pursuant to Ohio Adm.Code 3301-73-21(B)(5) and 3301-73-21(B)(14).

{¶ 84} Prude initiated and circulated the school's first student-authored school wide newspaper, coached the mock trial team on a voluntary basis, and survived a rigorous application process to be selected as a teacher in the Reach program, a University School summer enrichment program for gifted minority males. Well respected by educational professionals, colleagues, parents, and students, Prude was rated by his employer as a skilled teacher who established a

positive rapport with students and utilized varied learning situations to stimulate and instruct the students. Prude was also passionate about working with special needs students as demonstrated by his involvement with the special education Individual Education Plan ("IEP") program.

{¶ 85} The student had a history of disrespectful and disruptive behavior and had angrily grabbed a graphic arts teacher by the collar. The student was being verbally abusive toward Prude, threw food at him, and literally shoved Prude from behind as Prude returned to his lunch table to attempt to eat in peace after removing the student from Prude's immediate area. The student persisted and Prude removed the student several times and stated that was his sole intent. Physical restraint may be reasonable under the circumstances where the "student is a risk to himself" "and to others in the classroom, including the teacher." *Orth*, 10th Dist. Franklin No. 12AP-155, 2012-Ohio-4512, ¶ 17. Prude was in the lunchroom due to a lunch-duty assignment.

{¶ 86} Older, experienced teachers and staff members, some standing only several feet away, witnessed the interactions, evidenced no apparent concern, and made no attempt to intervene or assist the young teacher though testimony supports they were required to do so. In addition, the injury was accidental. *See Orth*. When the incident occurred, the student's bookbag impacted the reportedly defective window and Prude held the student's arms to prevent the student from falling. The student's reaction was to continue to speak to Prude and smile as the video depicts.

{¶ 87} I would also find, as Prude advanced, that Prude's voluntary resignation for personal reasons should not have been wielded as an aggravating factor.